

## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

### DEPARTMENT OF CORRECTIONS
Vicente Taman Seman Building
P.O. Box 506506, Saipan, MP 96950
Telephone: (670) 664-9061 Facsimile: (670) 664-9515



| Part | Section | Subject | Policy No. | Review Date |
|---|---|---|---|---|
| Institutional Services | Safety and Emergency Procedures | Hostage/Riot Response Plan | 3.2.3 | |
| **ACA Standard** | 3-ALDF-3B-14 Threats to Security Such as Riots and Hostage Situations | | | |
| **Consent Decree** | Paragraph 54 Develop Facility Policies and Procedures | | | |

## I.    PURPOSE

To provide general information, establish guidelines and response procedures in the event of a hostage and/or riot situation in the Department of Corrections facility.

## II.    POLICY

It is the policy of the Department of Corrections to prevent hostage and/or riot situations from occurring through sound security practices, establishing good communication between correctional staff and management, and positive interaction between staff and inmates/detainees. The general policies of the Department of Corrections during a hostage and/or riot situation are as follows:

A. Every reasonable means will be exhausted to preserve the lives of the hostage(s), staff and inmates/detainees.

B. To negotiate with the perpetrators for a non-violent solution to the situation.

C. No exchange of hostages or giving of more hostages.

D. Hostages lose all rank and status within the Department.

E. Perpetrators will not be permitted to remove hostages from the facility.

F. Will not negotiate for weapons, explosives, alcohol, and/or drugs.

G. Inmate/detainee release or escape from the facility will not be considered.

1

H. Should it become evident that lives may be lost, immediate steps should be taken to minimize the loss.

I. Hostage-takers will be prosecuted.

J. Neither keys nor weapons will be surrendered to the hostage takers.

## III. DEFINITIONS

**Amnesty:** Is the abolition and forgetfulness of the offense.

**Chain of Command:** A prioritized list, by job title, of the individuals who would assume command of the facility in an emergency.

**Initial Incident Commander:** The person in charge of the facility and the emergency at the beginning of a large-scale crisis.

**Incident Commander:** The individual, by job title, who assumes and maintains authority over the facility and the emergency once he or she arrives and is briefed. The person who remains in charge until the emergency has been resolved.

**Chemical Agent:** A weapon that incapacitates an individual by chemical means.

**Electronic Restraining Device (Stun Gun):** A device that helps control an individual by stunning with an electrical discharge.

**Hostage-Taking:** Is one or more persons securing total control over another person or persons.

**Negotiation:** Refers to a dialog between inmates and authorities that focuses on achieving an end to the incident.

**Post Traumatic Stress Syndrome:** A psychological disorder that develops in some individuals who have been exposed to a major traumatic experience. The person is typically numb at first but later has symptoms including depression, excessive irritability,

**Triage:** Is the sorting out and classifying of patient's health complaints to determine priority of need and the proper place for health care to be rendered.

## IV. PROCEDURES

### A. General Information

1. Hostage and/or riot situations happen at any time, any place, and under any circumstances. Correctional staff should understand that the potential of being taken hostage in a prison environment is real. Based on a survey of correctional

staff, the most feared situation seemed to be the fear of being taken hostage by an inmate. There is good reason for this fear. The act of taking a staff hostage is an act of desperation. Desperation and nervousness combined make for a dangerous situation. All hostage situations are different. What works in one situation might not work in the next. A hostage situation may take a variety of forms due to the number of hostages and/or inmates involved, location of the crisis, and the actions or attitudes of the captors or hostages. Historically, the average length of time it takes to resolve a hostage situation is approximately 14 hours. One characteristic that can be found in every hostage situation is stress. Everyone involved experiences stress, especially in the beginning of the incident. **Most hostage-taking situations occur due to staff failure.** The best strategy in preventing hostage-taking is to establish strategies that can serve to reduce the tensions and misunderstandings among inmates, and/or between inmates and correctional officers. The following strategies may prevent hostage-taking:

    a.  Sound communication between management staff and line employees regarding facility operations.

    b.  Effective communication between corrections officers and inmates concerning the Division's goals and objectives, programs and procedures.

    c.  Accessibility and visibility of correctional staff in all parts of the facility.

    d.  Prompt reporting to management of possible unrest situations in the facility.

    e.  Providing constructive activities and recreational programs for inmates.

    f.  Operating a well-designed classification system that enables inmates to live in a relatively safe and healthy environment.

    g.  Ensuring fair and impartial treatment of inmates.

**B. Warning Signs**

1.  Hostage-taking rarely occur at an instant without warning. Signals or warnings are usually present although they might not be obvious until after the crisis is over. Supervisors and corrections' officers will constantly be on the alert for any indications of impending problems. Effective communication up and down the chain of command offers the best opportunity to intervene in these situations. The following are some common indicators of impending problems:

    a.  Reduced communication between correctional staff and inmates.

    b.  A large increase in the number of inmate complaints.

    c.  Inmate avoidance of contact with employees.

    d.  Increase incidents of vandalism that produce weapons.

    e.  An upsurge in disciplinary offenses and assaults on staff.

    f.  Hoarding commissary items in cells or personal property or pictures being sent home.

    g.  An increase in disciplinary reports or in the number of inmates requesting protective custody.

h. Inmates banding together in unusual groups but disbanding when staff approaches.

i. Inmates making excessive and/or specific demands.

j. Favorite staff being told not to come to work or come to work at a certain time.

k. Reduced inmate visitors.

l. Normally active or loud inmates becoming quiet.

m. Demands for safety from staff.

**C. Other Contributing Factors**

In addition to the above signs of unrest situation or tension, the following underlying issues can contribute to hostage-taking:

1. Racial issues.
2. Food services.
3. Medical treatment.
4. Recreation.
5. Visitation.
6. Correspondence.
7. Parole policies.
8. Misinformation.
9. Reduction of privileges.
10. Dissatisfaction with certain employees.
11. Inadequate information about new policies and programs.

Corrections officers should be quick to recognized problem areas and take necessary corrective measures. Furthermore, corrections officers shall explain to the inmates the reasons for the policies and procedures and why it cannot be changed.

**D. Categories of Hostage Takers**

1. The Criminal
2. The Mentally Disturbed Person
3. The Organized Terrorist
4. The Confined Person

**E. How Hostage Situations Begin**

1. A Crime in Progress
2. A Riot or Other Mob Action
3. An Inmate Grievance
4. An Individual Action by a Disturbed Inmate

**F. Reasons Why Hostages are Taken and Held**

1. Money
2. Freedom
3. Political Cause
4. Release of Prisoners
5. Better Prison Equipment and Conditions
6. Amnesty

## G. Resolving Hostage Situations

1. Negotiations
2. Coordinated Assault
3. Use of Chemical Agents
4. Use of Sniper Fire

## H. Hostage Survival

1. If you are taken hostage, a good rule to follow is "Lie Low, Go Slow." Don't be a hero. Accept your situation and be prepared to wait. Maintain a low profile.

2. The first fifteen to forty-five minutes are the most dangerous for all concerned. Follow the instructions of your captor. Cooperate.

3. Don't speak unless spoken to and only if necessary. Try to be polite and respectful, but not phony.

4. Try to get rest. Sit if you can. If the situation goes on for a long period of time, try to sleep.

5. Don't make suggestions to your captor. If your suggestion goes wrong, your captor may think you planned it that way.

6. Attempt an escape only if you are absolutely sure you can successfully make it, and even then, rethink you escape plan before you put it into action.

7. If you, or anyone else, need special medication or medical attention, inform the captors.

8. Be aware of everything you see and hear. Try to remember the number of hostage-takers, their descriptions and conversations, the weapons they have, etc. Try to establish the number and identities of other hostages. You may be released and this information will be very helpful in forming strategies to diffuse the situation.

9. Don't become argumentative with your captors or other hostages. Express a cooperative attitude. Build a rapport with your captors.

10. Don't beg for your safety. Try not to cry or break down. Prisoners view this as a weakness and they can easily see you as a non-person, not worth saving.

11. Don't turn your back on your captors unless directed to do so. Be careful not to give the impression that you are staring at them. When speaking to your captors, make an effort to maintain eye contact. Your captors are less likely to harm you if there is eye contact during the conversation.

12. There are times when you might recognize the hostage-takers. If the hostage-takers are wearing masks or other types of head covering, do not under any circumstances call them by name. They do not want to be recognized. If they are not wearing masks or head covering, you may call them by their first names only, no "nicknames," last names, or numbers.

13. Be patient. Even though the negotiators and CERT teams may appear to be doing nothing, they are engaged in a plan designed to rescue you unharmed as soon as possible. Do not try to negotiate your own release. You may say something in conflict with outside negotiators and anger your captors.

14. Downplay your authoritative appearance by removing department badges, nametags, rank insignia, and DOC patch. These should be removed gradually and tactfully and placed in your pants pockets out of the sight of your captors.

15. If you believe that a tactical assault is soon to take place, attempt to position yourself away from windows and doors. Attempt to position yourself on the floor. When the assault team enters, assume a surrender position, lying in a prone position on the floor with your hands clasped behind your head. Do not try to help. Hostage-takers may have changed clothing with another hostage. If you try to help, you could be mistaken for an inmate.

16. Sexual assaults rarely happen in hostage situations. In the event of sexual attack:

    a. Verbal resistance first. Move away from the perpetrator.
    b. Passive resistance second. Down play the sexual excitement. Just go limp.
    c. Active resistance last

## I. The Stockholm Syndrome

On August 23, 1973, a bank robbery occurred at Sveriges Kreditbank in Stockholm, Sweden. Four employees were held hostage for 131 hours. As a result of the long hours of being held hostage in a room, the four employees developed a positive bond that affects the hostages and the hostage-taker, hence, the Stockholm Syndrome. The Stockholm Syndrome appears to be an automatic, probably unconscious, emotional response to the trauma of being a victim. The will to survive causes the victim to decide consciously that the most advantageous behavior in this situation is to befriend

the captor(s). The hostage-takers befriended the hostages because they are the only one there to interact. This phenomenon does not occur in all hostage situations.

The Stockholm Syndrome consists of one or more of the following behaviors:

1. The hostages will begin to have positive feelings towards their captors;
2. The hostages will begin to have negative feelings towards the authorities; or
3. The hostage-takers will begin to develop positive feelings towards their hostages.

To achieve a successful resolution of a hostage situation, law enforcement must encourage and tolerate the first two phases so as to induce the third and thus preserve the lives of all participants. As the bonding increases, the likelihood of the hostage-takers harming the hostages decreases.

The negative aspects to the syndrome are as follows:

1. Any information coming from the hostages may be unreliable.

2. The hostages may deliberately or unconsciously misrepresent the weapons held by the hostage-takers. They may become advocates of the hostage-takers.

3. Hostages may act counter to the commands of the police during an assault.

**J.  Hostage Response Plan**

   **1.  Objectives**

      a.  To quickly isolate and contain the situation.
      b.  To regain control and reestablish order.
      c.  To minimize the impact of the situation on other operations within the facility.
      d.  To be prepared for additional emergencies.
      e.  To use only the amount of force necessary.
      f.  To ensure safety and security for inmates, staff and the general public.

**K.  Response Priorities**

In responding to a hostage and/or riot situations, the following shall be considered:

1. Protection of the general public.

2. Safety of institutional personnel.

3. Safety and welfare of the hostages.

4. Inmate welfare.

   5. Protection of property.

**L. Riot Response Plan**

  **1. Strategy**
   The best strategy in preventing a riot situation in the facility is to establish strategies that can serve to reduce the tensions and misunderstandings among inmates/detainees, and between inmates/detainees and correctional officers. The following strategies can reduce the occurrence of a riot:

   a. Sound communication between management staff and line employees regarding facility operations. Good communication between correction officers and inmates/detainees concerning plans, programs and procedures.

   b. Accessibility and visibility of all correction staff in all parts of the facility.

   c. Prompt reporting to management of possible unrest in the facility.

   d. Providing constructive activities and recreation programs for inmates.

   e. Operating a well-designed classification system that enables inmates/detainees to live in a relatively safe and healthy environment.

   f. Ensuring fair and impartial treatment of inmates/detainees.

  **2. Objectives**

   a. To quickly isolate and contain the situation.

   b. To regain control and reestablish order.

   c. To minimize the impact of the situation on other operations within the facility.

   d. To be prepared for additional emergencies.

   e. To use only the amount of force necessary.

   f. To ensure safety and security for inmates/detainees, staff and the general public.

  **3. Types of Disturbance**

   a. Disturbance between two or more inmate/detainee factions.

   b. Disturbance of a general nature to seek correction of some real or imagined grievance.

    c.  Disturbance developed as a camouflage for an escape attempt.

    d.  Disturbance may arise from spontaneous reactions as a result of an incident such as stabbing.

The types of disturbances listed above are just some of the situations that can occur in a facility. Staff should be mindful that anything can trigger a riot or disturbance, which can eventually lead to hostage taking and property damages.

## M. Incident Command System

In a hostage and/or riot situation, the Incident Command System will be implemented. The Shift Commander will refer to the Incident Command System policy and procedures in addressing the situation.

Prepared By: _____       10-25-07
              John M. Ayuyu                                  Date
              Deputy Director of Corrections

Reviewed By: _____       10/26/07
              Gregory F. Castro                               Date
              Director of Corrections

Approved By: _____       10/26/07
              Lino S. Tenorio                                Date
              Commissioner of Corrections

# Department of Corrections
## Corrections Cadet Basic Training

| | | | | |
|---|---|---|---|---|
| Policies and Procedures | Public Service and Telephone Reception, Department Computers, Inmate/Detainee Housing, Environmental Conditions, Program and Service Areas, Administrative and Staff Areas, Access and Accommodation to the disabled, Physical Security of the Institution, Use of Parking Spaces | Mr. John Ayuyu, Deputy Director | Tuesday Week II. | 0800-1130 1230-1500 |
| Policies and Procedures | Control of Contraband, Inmate/Detainee Transport Outside the Facility, Perimeter Security, Inmate/Detainee Movement, Radio Communication, Housing Unit Supervision, Use of Firearms | Mr. John Ayuyu, Deputy Director *[handwritten: DUPLICATE SEE TUES, WK 1 r-1300]* | Wednesday Week II. *[handwritten: r-1300]* | 0800-1200 1300-1700 |
| Policies and Procedures | Patrol and Inspection, Use of DOC Vehicles, Permanent Log, Post Order, Designated Security Post, Metal Detector, Bomb Threat, Incident Command System, Fire Prevention, Flammable and Toxic Materials, Emergency Power, Earthquake Response Plan, Preventive Maintenance, Law Library, Protection from Harm, Inmate/Detainee Personal Property, General Food Service Diet, Sanitation and Hygiene, Waste Disposal Procedures | Mr. John Ayuyu, Deputy Director | Thursday Week II. | 0800-1200 1300-1700 |
| Policies and Procedures | Pest Control, Custodial Storage, Housekeeping, Laundry, Sick Call, Inmate Death, Notification of Next of Kin, Privacy of Care, Inmate/Detainee Medical Records, Informed Consent, Special Health Care Programs, Access to Care, Pharmaceuticals, Written and Verbal Clinic Orders, Female Health Care Issues, Prohibition of Medical Experiment | Mr. John Ayuyu, Deputy Director | Friday Week II. | 0800-1200 1300-1700 |
| Policies and Procedures | Health Training for Correctional Staff, Dental Care, Medical Management of HIV-Positive Inmates/Detainees, Social Services, Work Release Program, Program Activity, RSAT Program, Recreation Activities, Inmate Mail, Inmate/Detainee Visitation, Library Services, Religious Programs | Mr. John Ayuyu, Deputy Director | Monday Week III. | 0800-1200 1300-1700 |
| Policies and Procedures | Hostage Survival | Mr. John Ayuyu, Deputy Director | Tuesday Week III. | 1300-1700 |
| Policies and Procedures | Fire Safety | DFS- Fire Personnel | Wednesday Week III. | 0800-1200 1300-1700 |
| Policies and Procedures | Suicide Prevention | CGC | Thursday Week III. | 0800-1200 |
| Policies and Procedures | Universal Precaution Against Infectious Diseases | Mr. John Ayuyu, Deputy Director | Thursday Week III. | 1300-1700 |
| Policies and Procedures | Report Writing | Mr. John Ayuyu, Deputy Director | Friday Week III. | 0800-1200 1300-1700 |
| Policies and Procedures | Report Writing | Mr. John Ayuyu, Deputy Director | Mon-Tues. Week IV. | 0800-1200 1300-1700 |