JOCELYN SAMUELS
Acting Assistant Attorney General
JONATHAN M. SMITH
Chief
SHELLEY R. JACKSON
Deputy Chief
JEFFREY R. MURRAY
Trial Attorney
Special Litigation Section
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington, D.C.  20530
PHONE:  (202) 353-9269
FAX:  (202) 514-0212
EMAIL:  jeff.murray@usdoj.gov

ALICIA A.G. LIMTIACO
United States Attorney
MIKEL SCWHAB
Assistant U.S. Attorney
JESSICA F. CRUZ
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam  96910
PHONE:  (671) 472-7332
FAX:  (671) 472-7215
EMAIL:  mikel.schwab@usdoj.gov

*Attorneys for the United States of America*

OFFICE OF THE ATTORNEY GENERAL
Joey Patrick San Nicolas
Attorney General

Teresita J. Sablan (F0480)
Assistant Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP  96950-8907
Tel:     (670)-664-2341
Fax:    (670)-664-2349
e-mail: sablan.teresita@gmail.com

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br> v. <br><br> **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS** et al., <br><br> Defendants. | CIVIL CASE No. 99-00017 <br><br> **FINAL CONSENT DECREE REPORT IN SUPPORT OF TERMINATION** <br><br> Judge: Hon. Ramona V. Manglona <br> Date: May 15, 2014 <br> Time: 8:30 a.m. |

COMES NOW the Defendants, the Commonwealth of the Northern Mariana Islands, the Governor of the Northern Mariana Islands, the Commissioner of the Department of Corrections,[1] and the Secretary of the Department of Community and Cultural Affairs (collectively, "the Commonwealth"), through undersigned counsel, and the Plaintiff United States of America, through undersigned counsel, to respectfully submit this Final Consent Decree Report. The parties filed a joint motion to terminate the Consent Decree on January 27, 2014, and the Court directed the parties to file a final report. The parties submit this report pursuant to that order.

## I.    INTRODUCTION

In 1998, the United States investigated the Commonwealth's adult and juvenile detention facilities. *See* Consent Decree at 1–2 ¶ 1, ECF No. 4. As detailed in its findings letter , the United States observed the following: staff members were not trained for response in a fire emergency; facilities lacked fire alarms, smoke detectors, sprinklers, and emergency generators; cells were keyed with individual locks, which greatly increased risk in the event of fire; emergency exits were not marked; many cells lacked running water; toilets would not flush; shower areas were covered in mold and mildew; there was poor ventilation and no medical screening, increasing the

---

[1] The Commissioner of Corrections succeeded the Commissioner of Public Safety, the Secretary of Labor, and the Secretary of Community and Cultural Affairs as the official in charge of the detention facilities that are the subject of the Consent Decree.

risk of transmitting infectious diseases like tuberculosis; facilities were antiquated, dilapidated and operating at or near their safe capacity; facilities had inadequate perimeter fencing, poor sight lines, and lacked an adequate maximum security housing area; and inmates and detainees roamed freely, increasing the risk of harm from inmate-on-inmate violence and putting staff at an increased risk of harm.

Pursuant to 42 U.S.C. §§ 1997–1997j, the Civil Rights of Institutionalized Persons Act, the United States initiated this action on February 23, 1999. *See* Complaint, ECF No. 1. Two days after the complaint was filed—over fifteen years ago—the Commonwealth and the United States entered into a Consent Decree. The aim of the Consent Decree was to ameliorate the conditions of the Commonwealth's detention institutions that were deemed to violate the civil rights of those detained at the facilities, and to safeguard against future violations.[2]  Since the implementation of the Consent Decree, the parties have worked cooperatively to identify violations and address them. The parties agree that the purpose of the Consent Decree has now been achieved and that termination of the Consent Decree is appropriate.

In a visit to the Commonwealth on April 2, 2014, Assistant United States Attorney Mikel Schwab participated in an on-site tour of the Adult Correctional Facility ("ACF") and Juvenile Detention Unit ("JDU").  On the basis of AUSA Schwab's observations and other evidence obtained through its enforcement efforts,[3] the United States believes that the Commonwealth has satisfied the intent of the Consent Decree and that it is in substantial compliance with the

---

[2] At the time the parties entered into the Consent Decree, there were six facilities at issue: the Saipan Prison Complex, the Saipan Detention Facility, the Kagman Youth Facility, the Saipan Immigration Detention Facility, the Tinian Detention Facility, and the Rota Detention Facility. Today, there are four facilities—the Adult Correctional Facility, the Juvenile Detention Unit, the Tinian Detention Facility, and the Rota Detention Facility. The former two are modernized facilities that were constructed in accordance with the Consent Decree, and the latter two are used as temporary holding facilities.

[3] The Department of Justice Civil Rights Division conducted prior on-site inspections of DOC facilities with its attorneys and consultants in 2001, 2002, 2003, and 2008, and also received and considered information about improved conditions in DOC from other federal agencies including the U.S Attorney's Office, the U.S. Marshals Service, and Immigration and Customs Enforcement.

Consent Decree's terms. During the April 2014 visit, the Commonwealth demonstrated conditions that were in stark contrast to those in 1999—the current facilities feature modern equipment able to respond to fire and other emergencies (*e.g.*, lighted exit signs in the proper places, fire extinguishers with current inspection tags, smoke detectors, and sprinklers); the facilities were sanitary (*e.g.*, no visible mold, hot water available for showers, and functioning centralized air conditioning); the staffing was sufficient and officers were responsive to his questions; the medical professionals were accessible and also responsive to his questions; and the implementation of video-monitoring systems and radios to maintain supervision of confined persons.

## II.    STANDARD FOR TERMINATION

Pursuant to paragraph 72 of the Consent Decree, "[a]t any time after two (2) years from the date of entry of this Decree, and after substantial compliance has been maintained for no less than one year, the CNMI may move to terminate this Decree." Consent Decree at 22–23 ¶ 72, ECF No. 3. Further, "[a]ny motion to terminate must detail all aspects of the Defendants' compliance with each provision of this Decree, supported by affidavits and supporting documentation." *Id.*

"Substantial compliance is not susceptible of a mathematically precise definition." *Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011) (quoting *Joseph A. v. N.M. Dept. of Human Servs.*, 69 F.3d 1081, 1085 (10th Cir. 1995) (internal quotation marks omitted).   However, "substantial compliance does imply something less than a strict and literal compliance with the contract [or in this case, the Consent Decree] provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish." *Id.* (quoting *Wells Benz, Inc. v. United States*, 333 F.2d 89, 82 (9th Cir. 1964) (internal quotation marks omitted).

## III.   REPORT ON SUBSTANTIAL COMPLIANCE

The Commonwealth has substantially complied with the terms of the Consent Decree; any minor deviation from literal compliance is trivial and does not defeat the purpose of the Consent Decree. To ensure substantial compliance with each provision of the Consent Decree, DOC assigned officers with the responsibility for assuring compliance with each provision of the Consent Decree; each officer has certified that the documents provided support compliance with the respective provisions for which he or she is responsible. *See* Exh. A at 3–12. Additionally, AUSA Schwab conducted an on-site inspection and the United States has determined that the Commonwealth is in substantial compliance with the Consent Decree. As supported by the accompanying exhibits and the on-site visit determination, the Commonwealth is in substantial compliance with the planning, fire safety, sanitation, medical care, security and protection from harm, new construction, and compliance provisions of the Consent Decree.

### A.   Planning

The planning section requires that the Commonwealth develop and implement long-term and short-term plans.  *See* Consent Decree at 4 ¶ 9. The plans must address facility population projections and classification of populations, space requirements, programming and services, staffing and training, security and emergency planning, and funding. *See id.* The Commonwealth must provide the United States with copies of the plans, and the United States may disapprove of the plans in whole or part. *See id.* at 5 ¶ 11.

The Commonwealth developed both long-term and short-term plans. *See* Exh. B; *see also* ECF No. 5 at 1–3. The United States reviewed the plans and did not disapprove in part or in whole. The plans are now embodied by the DOC and JDU Policies and Procedures, which are reviewed regularly and updated to address new issues and to stay up to date with changing standards. *See e.g.,* Exh. B at 8–13; *see also* ECF No. 13, DYS parts 4–7 (JDU policies), ECF

Nos. 31-2 to 31-138 (DOC policies).

In addition to the planning-specific components, this section also provides certain exemptions from the Consent Decree requirements for the Rota Detention Facility ("RDF") and the Tinian Detention Facility ("TDF") if they are operated as temporary holding facilities. *See id.* at 5 ¶ 12. To qualify as temporary holding facilities, the facilities cannot house inmates for more than twenty-four hours under normal circumstances or more than forty-eight hours under exigent circumstances. *Id.*

The Commonwealth operates RDF and TDF as temporary holding facilities. *See* Exh. C at 1–2; Exh. D at 1–2. Individuals who are arrested on Tinian and Rota are transported to Saipan that same day. *See e.g.*, Exh. C at 3–4; Exh. D 3–5. This has been the practice for these facilities, and this practice was memorialized by the DPS Commissioner in a directive to the respective resident heads. *See* Exh. C at 5–8. Thus, as temporary holding facilities, RDF and TDF are exempt from certain requirements. RDF and TDF are in substantial compliance with the applicable provisions of the Consent Decree. *See generally* Exh. C, D.

### B.   Fire Safety

The fire safety section requires the Commonwealth to protect confined persons from "undue risk of harm from fire and smoke." *See* Consent Decree at 6 ¶ 13, ECF No. 4. To satisfy this general mandate, the Commonwealth must implement and perform specific fire safety measures:

(1) Install working fire alarm system (¶ 14);

(2) Remove all bedding items made of polyurethane foam and use fire resistant or retardant items (¶ 15);

(3) Install a back-up generator (¶ 16);

(4) Survey substandard and hazardous electrical conditions and corrected problem

6

conditions (¶ 17);

(5) Install emergency lighting and exit signs (¶ 18);

(6) Provide metal waste receptacles and metal containers for combustible items (¶ 19);

(7) Use local common keys (¶ 20);

(8) Keep emergency keys readily accessible to staff and inform staff of location (¶ 21);

(9) Install automatic sprinkler at the main DOC facility (¶ 22);

(10) Establish a safe refuge area for emergency evacuations (¶ 23);

(11) Cease housing individuals in the wooden "half-way house" (¶ 24);

(12) Develop a fire-safety and emergency training program (¶ 25);

(13) Provide necessary fire evacuation equipment, including two emergency breathing apparatus (RDF and TDF may use the emergency breathing apparatus at their respective fire departments) and sufficient fire extinguishers (¶ 26);

(14) Document fire safety and emergency maintenance and inspection program, and test, service, and maintain fire safety equipment on a regular basis (¶ 27);

(15) Designate a fire safety and emergency coordinator at each facility to be responsible for fire safety and emergency equipment, training, and programs (¶ 28); and

(16) Staff each housing unit with at least one person who is responsible for and capable of detecting and responding to a fire or other emergency, and evacuating persons (¶ 29).[4]

The Commonwealth has substantially complied with the fire safety requirements: the facilities are equipped with working fire alarm systems (*see e.g.*, Exh. E at 1–3); all polyurethane foam items have been removed and replaced with fire resistant or retardant items (*see e.g.*, *id.* at 4–5); back-up generators have been installed and are regularly maintained (*see e.g.*, *id.* at 6–20); hazardous electrical conditions were surveyed and corrected; emergency lighting and exit signs

---

[4] There is an additional requirement for the Saipan Immigration Detention Facility, but that facility is no longer in use. *See* Consent Decree at 10–11 ¶ 30.

7

have been installed (*see e.g.*, *id.* at 21); metal waste receptacles and metal containers are available for combustible items; proper key systems were put in place (ACF operates under a remote keyless entry system with and JDU operates under a common key system) (*see e.g.*, *id.* at 22–37); emergency keys are conspicuously marked and stored in a designated location (*see e.g.*, *id.* at 23, 36–37);  all staff are aware of and have access to the keys' locations (*see e.g.*, *id.* at 31); automatic sprinklers were installed (*see e.g.*, *id.* at 2, 38–43); safe refuge areas have been designated for emergency evacuations (*see e.g.*, *id.* at 48–78); the wooden half-way house previously used to house some individuals was demolished; the requisite fire safety and emergency equipment has been provided (*see e.g.*, *id.* at 97); maintenance and inspections of fire safety systems and equipment are regularly performed and documented (*see e.g.*, *id.* at 98–159); Albert de los Reyes is the current designated fire safety and emergency coordinator; the requisite safety and evacuation plans have been implemented (*see e.g.*, *id.* at 160–162); all correctional officers are trained in fire safety and emergency procedures (*see e.g.*, *id.* at 45–47, 79–85); and fire drills are performed regularly (*see e.g.*, *id.* at 86–96).

### **C.    Sanitation**

The sanitation section requires that the Commonwealth provide "food prepared under sanitary conditions" and "sanitary conditions of confinement." Consent Decree ¶¶ 31–48. The Commonwealth is in substantial compliance with both aspects of the sanitation section.

#### *1.    Food Preparation*

The Commonwealth is in substantial compliance with the sanitary food preparation requirements. The Consent Decree requires the Commonwealth to:

(1) Serve food in sanitary conditions (¶ 31);

(2) Ensure that food handlers are properly trained in the basics of food protection and hygiene, and maintain records of their training (¶ 32);

8

(3) Use appropriate food warmers and insulated containers to maintain minimum temperatures during food transport and service (¶ 33)

(4) Ensure that all utensils are adequately cleaned and sanitized (¶ 34);

(5) Ensure that all food is stored at appropriate temperatures (¶ 35);

(6) Ensure appropriate water temperatures in food preparation and service areas (¶ 36);

(7) Maintain an effective pest control plan (¶ 37);

(8) Provide special diets that are approved by a qualified dietician where medically indicated (¶ 38); and

(9) Implement a regular service and preventive maintenance program for food service equipment and utensils (¶ 39).

At the end of 2011, the Commonwealth solicited bids from qualified vendors to provide food service for its facilities. *See* Exh. F at 3–7. The invitation to bid provided, among other things, that the contractor must pass an inspection by the Bureau of Environmental Health ("BEH") and follow both DOC policies and procedures (which incorporate the Consent Decree requirements) and the Bureau of Prisons ("BOP") Food Service Manual for the preparation and distribution of food. *See id.* at 4–5, 41–44.

The food service contract was awarded to Herman's Modern Bakery ("Herman's"). The health and sanitation requirements are incorporated into the contract, and Herman's has provided copies of their sanitary permits, inspection reports, and food handler certifications from BEH. *See id.* at 13, 20–27, 34–38, 49–54. Further, Herman's menus are reviewed and approved by a registered dietician and submitted to DOC for their approval. *See e.g.*, *id.* at 16–18. The dietician is also available to review and approve meals for individuals with special dietary requirements. *See id.* at 7 (requiring special meals and incorporated into the contract), 45–48, 56. Finally, officers have been trained by BEH employees in food handling and food safety procedures, and

DOC obtains regular pest control services from No Ka Oi. *See e.g.*, *id.* at 39–40, 65–74.

2.      *Sanitary Confinement Conditions*

The Commonwealth is also in substantial compliance with the sanitary confinement provisions of the Consent Decree which require:

(1) sanitary conditions of confinement (¶ 40);

(2) policies and procedures for daily housekeeping (¶ 41);

(3) inspections by the BEH and implementation of their recommendations (¶ 42);

(4) adequate lighting in cells and common areas, and lighting fixtures appropriate for use in a correctional setting (¶ 43);

(5) appropriate climate controlled ventilation (¶ 44);

(6) hot water in all bathrooms for personal hygiene and cleaning of the facility (¶ 45);

(7) adequate toilet and shower facilities (¶ 46);

(8) removal of hazardous chemicals from cells and common areas (¶ 47); and

(9) appropriate sleeping accommodations (¶ 48).

The Commonwealth has implemented written policies and procedures for daily housekeeping in the facilities, and a visit by the United States confirmed that these policies are implemented—the facilities are clean and well-maintained. Exh. F at 75–86. Additionally, BEH inspected the facilities and did not report any significant problems. *Id.* at 87–89. Further, DOC policies require that artificial lighting be provided in accordance with the Consent Decree requirements, and the policies have been implemented. *Id.* at 9. The facilities are also equipped with air conditioning and ventilation systems that provide at least fifteen cubic feet per minute per inmate of fresh forced air. *See id.* at 90–94.

DOC policy requires hot water in all bathrooms and the requisite water heaters are in place. *See id.* 95, 97–100. DOC provides adequate toilet facilities and ensures that one shower is

available for every twelve inmates. *See e.g.*, *id.* at 96, 99–100. During its site visit, DOJ confirmed that toilets, sinks, and showers were functioning throughout the facilities.

DOC removed all hazardous chemicals from cells and common areas. *See e.g.*, *id.* at 86 (JDU policy requiring removal of all hazardous materials).

All inmates and clients are provided with clean bedding and a sleeping surface that is at least 12 inches off the floor, typically a metal-frame bunk bed, with a vinyl-covered, cleanable mattress. *See e.g.*, *id.* at 101–02. The current populations of JDU and DOC are approximately 3 and 200, respectively, while their current occupancy capacities are 24 and 472,[5] respectively. Based on these numbers, the facilities provide sufficient beds for their current populations and can accommodate significant increases in their populations. *See id.* at 102–07.

The Commonwealth is in substantial compliance with the sanitation requirements of the Consent Decree. *See generally* Exh. F.

### D.     Medical Care

The medical care section requires the Commonwealth to provide inmates with basic access to medical care.  Specifically, the Consent Decree requires:

(1) health screenings for inmates at intake, PPD tuberculosis tests for inmates confined for more than seven days, and full medical assessments for inmates confined for 14 days or longer (¶ 49);

(2) administration of medication only by an appropriately trained nurse or other individual (¶ 50); and

(3) training of staff on the prevention of infectious diseases such as tuberculosis and hepatitis (¶ 51).

The Commonwealth is in substantial compliance with this section. *See generally* Exh. G.

---

[5] The current occupancy capacities are based on available beds. If necessary, these capacities could be increased to a maximum of 40 and 586, respectively, by adding more beds. *See* ECF Nos.  17 at 2 ¶ 2, 4 ¶ 5.

11

Medical care for inmates and clients is provided primarily by the Commonwealth Healthcare Corporation. *See* Exh. G at 1–6. Although the United States had some concerns about this arrangement, CHC continues to provide medical care and the Commonwealth has provided adequate assurance that it will do so in the future. *See e.g., id.* at 1–2, 15. Four registered nurses from the Commonwealth Healthcare Corporation (CHC) are assigned on a rotational basis to DOC, providing full-time nurse availability Sunday through Saturday during regular working hours. *See id.* at 5–6. Additionally, a nurse is always available on-call and a physician from CHC makes regular on-site visits. *See id.* at 3–6. If an inmate has a medical, mental or dental health issue that cannot be treated onsite, DOC transports the inmate to CHC for treatment. *See e.g., id.* at 3–4 ¶ 4, 21–26.

DOC policies and practices require that a health screening questionnaire be administered to new arrivals to detect contagious diseases, mental illness, and suicide risk, and that a tuberculosis test be administered. *Id.* at 31, 35–36, 37–43. New arrivals are moved into the general population only after their tuberculosis test returns a negative result. DOC also has policies in place regarding the administration of medicine and the prevention of the spread of communicable diseases, and the officers have received training on these issues as well. *See e.g., id.* at 45–73.

The Commonwealth is in substantial compliance with the medical care provisions.

**E.     Security and Protection from Harm**

The security and protection from harm section requires that the Commonwealth:

(1) provide adequate staffing for its facilities (¶52);

(2) train all correctional officers (¶53);

(3) develop comprehensive policies and procedures (¶54);

(4) develop an inmate classification plan (¶55);

(5) provide regular sight and sound supervision over confined persons (¶ 56);

(6) provide officers with ability to communicate to central command at all times (¶ 57);

(7) ensure that officers make regular rounds (¶ 58);

(8) separate special needs inmates from the general population and provide suicide monitoring when warranted (¶59);

(9) install a secure perimeter fence around facilities (¶ 60);

(10) segregate males and females at JDU (¶ 61); and

(11) control and account for tools and utensils or other items that can be used for weapons (¶ 62).

The Commonwealth is in substantial compliance with this section.

First, the facilities are adequately staffed with trained officers. There are seventy-three correctional officers assigned to ACF and fourteen staff assigned to JDU to monitor populations of 200 and 3, respectively. *See* Decl. of Comm. Mafnas. DOC recently enlisted thirty-five new correctional officers. *Id.* The officers were required to undergo and complete a series of trainings that included lectures, on-the-job training, and practical and physical training. *Id.*; Exh. H at 16–43. Additionally, DOC is working with the administration to secure funding to have all JDU employees who supervise clients undergo training to become full-fledged correctional officers.[6] *See* Decl. of Comm. Mafnas. The facilities are staffed and organized to provide direct sight supervision to ensure the safety of those in custody. *See e.g.,* Exh. H at 5–15.

Second, the Commonwealth developed and implemented comprehensive policies and procedures for DOC and JDU. *See id.* at 44–64 (table of contents for DOC and JDU policies and procedures); *see also* ECF No. 13, DYS parts 4–7; ECF Nos. 31-2 to 31-138. The policies and procedures specifically address inmate classification, including identification and separation of

---

[6] Currently, two of the fourteen JDU employees are full-fledged officers.

special needs inmates, separation of females and males, and security standards that provide for frequent rounds and specific duties for each post. *See e.g.,* Exh. H at 65–102 (ACF policy re: classification); 114–16 (ACF policy re: monthly evaluation of classification); 1–4 (ACF policies re: post assignment and duties).

Third, the requisite mechanisms are in place to ensure adequate supervision of the inmates. *See e.g., id.* at 124–45. The facilities have video-monitoring in central command units, officers are equipped with radios that connect to the central command unit, and the perimeters of the facilities are secured. *See e.g., id.* at 119–23. Additionally, DOC has policies in place to account for all tools and other items that can be used as weapons. *See id.* at 146–56.

The Commonwealth is in substantial compliance with the safety and protection from harm section.

### F.   New Construction

The new construction section sets forth requirements for facilities constructed after the implementation of the Consent Decree. *See* Consent Decree at 20 ¶ 63. Since the entry of the Consent Decree, the Commonwealth constructed two new facilities on Saipan: JDU and ACF. The design and construction of both facilities were performed in consultation with experts and with the approval of the United States. *See* ECF Nos. 5 at 1–3; 6 at 1–2; 7 at 2. The construction of JDU was completed and opened for occupancy in 2004, while construction of ACF was completed and opened for occupancy in 2008. *See* ECF No. 31 at 2 ¶¶ 3–4.

### G.   Compliance

The compliance section requires that the Commonwealth file regular reports regarding the status of compliance (¶ 66); maintain records to document compliance (¶ 67); assign a coordinator to oversee compliance (¶ 68); permit the United States access to documents and records as necessary to evaluate compliance (¶ 69); provide copies of the Consent Decree to all

14

employees at the subject facilities (¶ 70); and implement all provisions of the Consent Decree within 90 days of its entry unless otherwise stated (¶ 71).

The Commonwealth is in substantial compliance with this section. First, the Commonwealth has filed regular status reports (although not always timely) since the entry of this Consent Decree. *See generally* Civ. Case No. 99-00017 (N.M.I.D.), docket. Second, the Commonwealth maintains records to support compliance with this decree. *See* Comm. Mafnas Decl. Third, the Commonwealth has regularly assigned an assistant attorney general to coordinate with DOC and DOJ to achieve compliance with this Consent Decree. Fourth, the Commonwealth has provided the United States with documents and records necessary to evaluate compliance. Fifth, all employees have received copies of the Consent Decree. *See id.* Sixth, the Commonwealth did not implement all provisions within 90 days; however, the Commonwealth has now implemented all provisions and is in substantial compliance with the Consent Decree. *See generally* Exh. A–H.

//

//

//

//

//

//

//

//

//

//

//

15

## IV.   CONCLUSION

As discussed in the foregoing, the Commonwealth has demonstrated substantial compliance with the terms of the Consent Decree and achieved the object of the decree—the identified civil rights violations have been remedied and a solid framework is in place to protect against future violations.

RESPECTFULLY SUBMITTED this 30th day of April 2014.

**For the Commonwealth Defendants:**

_/s/_____
Teresita J. Sablan (F0480)
Assistant Attorney General

**For the United States:**

JOCELYN SAMUELS
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division

By:  _/s/_____
JEFFREY R. MURRAY
Trial Attorney