# EXHIBIT G

Documents in Support of Compliance with Medical Care Section (¶¶ 49–51)

**EXHIBIT G--MEDICAL CARE**




# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
# DEPARTMENT OF CORRECTIONS
### ADULT CORRECTIONAL FACILITY

## MEMORANDUM OF AGREEMENT

WHEREAS the Department of Public Health has the responsibility and capacity to deliver health care services to all residents on the CNMI; and,

WHEREAS the Department of Corrections has the responsibility and capacity to provide security confinement, and,

WHEREAS the Departments of Public Health and Corrections have areas of interest that present opportunities for efficient and effective collaboration; and,

WHEREAS the CNMI has obligations related to the Consent Decree entered in the case USA v. Governor of CNMI, DPS Commissioner, DoLI Secretary, & DCCA Secretary, Civil Action No. 99-CV-0017,

NOW THEREFORE the Departments of Public Health and Corrections hereby agree as follows:

1. Each category shall collaborate on areas of defined interest. Services provided hereunder shall be accomplished without transfer of funds between agencies.

2. The Department of Public Health shall provide medical and mental health services for individuals in the custody of the Department of Corrections in a manner consistent with the requirements of the Consent Decree.

3. The Department of Corrections shall provide security as necessary and appropriate for the Department of Public Health.

4. Each Department shall designate a contact person who shall be responsible to execute provisions of the Memorandum of Agreement and prepare reports related thereto.

5. Quarterly Reports reflecting services delivered, compliance with provisions of the Consent Decree and such other information as may be appropriate shall be prepared. The Quarterly Reports shall be submitted to the Secretary of the Department of Public Health, Commissioner of Department of Corrections, Governor's Senior Policy Advisor and the Consent Decree Coordinator.

EFFECTIVE: _05/28/09_

_____
Joseph Kevin P. Villagomez, Secretary
Department of Public Health

_____
Dolores M. San Nicolas, Acting Commissioner
Department of Corrections

Vicente Taman Seman Building
P.O. Box 506506 CK, Saipan MP 96950
Operations: Tel: (670) 237-2700  Fax: (670) 664-9848  Administration: Tel: (670) 237-2701/4/5  Fax: (670) 664-9515

000001

**EXHIBIT G--MEDICAL CARE**



# Commonwealth Healthcare Corporation
## Commonwealth of the Northern Mariana Islands
1 Lower Navy Hill Road Navy Hill, Saipan, MP 96950



June 7, 2013

Ramon C. Mafnas
Commissioner
Department of Corrections
P.O. Box 506506
Saipan, MP  96950

Dear Commissioner Mafnas,

This is to clarify that despite discussions in a previous CHCC Advisory Board meeting and even without the transfer of funds to CHCC for incurred expenses, CHCC acknowledges that we have the responsibility to provide health care services to all residents of the CNMI, including providing medical and mental health services for the individuals in the custody of the Department of Corrections (DOC).  This is also to confirm that such services have been provided to the inmates of DOC without interruption.

If you have any questions or concerns, please feel free to contact me directly.

Thank you.

Esther L. Muña
Interim CEO, CHCC

P.O. Box 500409 CK, Saipan, MP  96950
Telephone: (670) 236-8202 FAX: (670) 236-8356
E-mail: esther.muna@dph.gov.mp

**000002**

OFFICE OF THE ATTORNEY GENERAL
Joey Patrick San Nicolas
Attorney General

Teresita J. Sablan (T0089)
Assistant Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel:    (670)-664-2341
Fax:    (670)-664-2349
e-mail: sablan.teresita@gmail.com

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS** et al.,<br><br>Defendants. | CIVIL CASE No. 99-00017<br><br>**DECLARATION OF GREGORY KOTHEIMER, MD, IN SUPPORT OF COMPLIANCE WITH PARAGRAPHS 49a–51 OF THE CONSENT DECREE** |

I, Gregory Kotheimer, MD, hereby declare as follows:

1.    I am over the age of eighteen (18). I have personal knowledge of the matters stated herein, and if called to testify, could and would testify competently thereto.

2.    I am a medical physician currently employed by the Commonwealth Healthcare Corporation ("CHC"). As part of my duties at CHC, I provide medical services to those in the custody of the Department of Corrections ("DOC").

3.    As the assigned DOC doctor, I make visits to the Adult Correctional Facility ("ACF") at least twice per week to evaluate inmates and provide treatment as necessary. I also visit the Juvenile Detention Unit to evaluate and/or treat clients upon request by DOC.

4.    In carrying out these duties, I am assisted by the nurses who are assigned to DOC on a rotational basis. If I cannot make it to ACF or JDU to provide onsite treatment, I direct the

**000003**

nurses to have the inmate or inmates transported to the emergency room at CHC for medical treatment.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and was executed this 28th day of April 2014.

GREGORY KOTHEIMER, M.D.

**000004**

**EXHIBIT G--MEDICAL CARE**

OFFICE OF THE ATTORNEY GENERAL
Joey Patrick San Nicolas
Attorney General

Teresita J. Sablan (T0089)
Assistant Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel:    (670)-664-2341
Fax:    (670)-664-2349
e-mail: sablan.teresita@gmail.com

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>       v.<br><br>COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS et al.,<br><br>              Defendants. | CIVIL CASE No. 99-00017<br><br>**DECLARATION OF JORDAN DANAO, RN, IN SUPPORT OF COMPLIANCE WITH PARAGRAPHS 49a–51 OF THE CONSENT DECREE** |

I, Jordan Danao, hereby declare as follows:

1.      I am over the age of eighteen (18). I have personal knowledge of the matters stated herein, and if called to testify, could and would testify competently thereto.

2.      I am a registered nurse and have served in that capacity for ten years. I am currently employed by the Commonwealth Healthcare Corporation and assigned to the Department of Corrections ("DOC"). My duties include assessing and evaluating inmates and clients that require health care, as well as assisting doctors with treatment.

3.      There is a medical unit within the Adult Correctional Facility. There are currently four registered nurses assigned to the medical unit who work on a rotational basis (Sunday through Saturday) to perform health screening, administer PPD tuberculosis testing, administer

000005

# EXHIBIT G--MEDICAL CARE

medication, and schedule physical health assessments for inmates. The medical staff also visits the Juvenile Detention Unit to provide these medical services to the clients.

4.    In addition to regular duties, the medical staff trains DOC staff in the prevention of the spread of communicable diseases.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and was executed this 28 day of April 2014.



_____
JORDAN DANAO, RN

2

**000006**

**EXHIBIT G--MEDICAL CARE**



# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

**Eloy S. Inos**
Governor

**Jude U. Hofschneider**
Lieutenant Governor

The Honorable Joseph P. Deleon Guerrero
House Speaker
18th Northern Marianas Commonwealth Legislature
Saipan, MP 96950

040114

The Honorable Ralph DLG. Torres
President of the Senate
18th Northern Marianas Commonwealth Legislature
Saipan, MP 96950

Dear Speaker Deleon Guerrero and President Torres:

In accordance with Article III, Section 9 of the CNMI Constitution and 1 CMC Section 7201(a)(1) (Planning and Budgeting Act), I submit herewith the proposed budget for the Commonwealth Government and Related Agencies for Fiscal Year 2015, beginning October 1, 2014 and ending September 30, 2015. As mandated by the Constitution, the budget submitted herein is balanced, where the total amount of proposed expenditures does not exceed total estimated resources available for appropriation.

**Fiscal Climate**
The gross budgetary resources reported by the Secretary of Finance for FY 2015 are $170,055,000. After adjusting for debt service appropriations, earmarked funds, and other legal obligations, the net resources available for general appropriation is $134,330,375. This represents an increase $10,930,375 or 8.9% of the previous fiscal year. Tourism has steadily been showing promising signs of growth and the Commonwealth has realized significant increased tax collections in this industry. The Marianas Visitors Authority projects continued upward growth in tourism throughout FY 2015, but that growth will be limited to current capacity. Hotel rooms and airline seats are at capacity and cannot increase unless additional investment is made in the hotel and airline industries. As a result, such forecast is factored into the attached budget proposal. Tax collections from CNMI businesses also continue to show increases as a result of greater compliance with existing laws and opportunities to stay in

Caller Box 10007 Saipan, MP 96950 Telephone: (670) 664-2200/2300 Facsimile: (670) 664-2211/2311

**000007**

# EXHIBIT G--MEDICAL CARE

compliance as a result of business friendly measures such as the tax amnesty granted in FY2014. The strengthening of enforcement laws, as well as greater enforcement actions and collaboration by enforcement arms of the government support the increased resources reflected in this proposal.

This budget package requires the suspension of the following statutory earmarks:

1.  Public Laws 15-5 and 14-54 (Non-Resident Worker Fund fees to NMC and PSS; and 10% of Gaming Jackpot Tax to PSS)
2.  4 CMC §1508(a) and (b) (10% of General Fund poker fees to the Human Resources Development fund (WIA) and 50% to the Retirement Fund)

The total identified budgetary resources for FY 2015 before transfers out and debt service appropriation is illustrated in the Table below:

Table 1: Budgetary Resources

| Budgetary Resources | | |
|---|---:|---:|
| Business Gross Revenue Tax | 65,000,000 | 38% |
| Income Taxes | 37,550,000 | 22% |
| Excise Taxes | 28,000,000 | 16% |
| Other Taxes | 22,050,000 | 13% |
| Licenses and Fees | 11,335,000 | 7% |
| Charges for Services | 2,100,000 | 1% |
| Other Revenue | 4,020,000 | 2% |
| **Total Identified Budgetary Resources** | **170,055,000** | **100%** |



000008

**EXHIBIT G--MEDICAL CARE**

**Budget Strategy**

Our primary goal in the development this budget is to allocate sufficient funds to address the terms of the Settlement Agreement (Inos vs. Johnson) reduce costs, and increase the efficiency of government operations. Departments were directed to assess their programs and eliminate operational redundancies, promote energy conservation and curtail or eliminate non-essential spending, including reduction in overtime costs.

This approach was considered in evaluating all departmental submissions and established a baseline reduction of 25% for each activity. The second approach was to examine past and current activities to ensure any proposed decrease in allocation would not jeopardize the delivery of basic public services. The third approach was to eliminate all number of positions (NOP) that were vacant and unannounced including all new positions. The result of this examination brought the departmental request to current level with the exception of a few that went below current budget.

This proposal, validated by the budget worksheets enclosed, is the net result of the funding requested by the departments and activities which exceed available resources by $50.3 million. In accordance with my constitutional duty to maintain a balanced budget, only very critical activities were considered in this proposal. Accordingly, this budget submission illustrates the following underlying assumptions and considerations:

1) Inclusion of funding allocation towards the Settlement Fund formerly known as the Northern Mariana Islands Retirement Fund;
2) Inclusion of funding for active retirees Group Health and Life Insurance;
3) Reinstatement of the Defined Benefit Contribution to 37.39%;
4) Allocation of funding for the Commonwealth Government Employees Credit Union;
5) Decreased dependency and strengthening of Medical Referral Program in the general fund;
6) Funding allocation for the newly Elected Office of the Attorney General;
7) Equal allocation to the First and Second Senatorial Districts;
8) Continued contribution of $2.0 million to the Commonwealth Healthcare Corporation;
9) Allocation of funds to satisfy Maintenance of Effort (MOE) obligation due to the Public School System and the Northern Marianas College;
10) Transition of the Number of Positions (NOP) from the Department of Public Works, Roads and Grounds Division and into the Department of Lands and Natural Resources, Parks and Recreation Division;
11) Application of the proposed minimum wage increase by $0.50 effective September 30, 2014 for those currently earning $5.55 per hour;
12) Maintained decentralization of utility expenses into the respective departments;

**000009**

# EXHIBIT G--MEDICAL CARE

13) Removal of all vacant and new positions except those currently announced; and

14) Imposition of travel restrictions using local funds.

The effects of the above resulted in a net expenditure budget of $134,330,375. This net budget requirement excludes expenditures to be absorbed by the Compact Impact reimbursements and transfer of eligible expenditures into non-general fund sources in the amounts of $1,930,443 and $4,600,000 respectively. The net operating budget for appropriation is $134,330,375, an amount equal to resources available for general appropriations; hence, a balanced budget.  .

**Estimated Gross Budgetary Resources for FY 2015:**                                    **170,055,000**

A. Less Revenue Transfers to Other Funds:

| | | |
|---|---:|---:|
| 1. PL 13-38 Cigarette Excise Tax to Tobacco Control | (2,700,000) | |
| 2. 4 CMC §1402(a)(16) GHL1 | (4,500,000) | |
| 3. PL 13-42 10% Excise Tax to Solid Waste | (2,800,000) | |
| 4. CIQ Reimbursement | (500,000) | |
| 5. 4 CMC §1803(b) NMIRF hotel/container tax (per court order) | (1,550,000) | |
| 6. 4 CMC §1803(b) MVA hotel/container tax (earmark) | (12,720,000) | |
| 7. PL 18-30 Electronic Gaming Transfers | (2,500,000) | (27,270,000) |

B. Less Debt Service Previously Appropriated:

| | | |
|---|---:|---:|
| 1. 2007A Refunding Bond Payment | (5,144,750) | |
| 2. 2007B Refunding Bond Payment | (3,309,875) | (8,454,625) |

**Subtotal**                                                                    **(35,724,625)**

**Net FY 2015 Budgetary Resources Available for Appropriation**                    **134,330,375**

Other resources for this proposal were considered and are distributed in Table 2 below:

Table 2:  Net Budgetary Resources

| Net Budgetary Resources | |
|---|---:|
| General Fund | 134,330,375 |
| Commonwealth Worker Fund (CW) | 1,400,000 |
| Outside Sources | 3,200,000 |
| Compact Impact Funds | 1,930,443 |
| Public Lands | 3,399,438 |
| **Total** | **144,260,256** |

000010

# EXHIBIT G--MEDICAL CARE



The illustration above excludes autonomous agencies and other programs and activities that are self-revenue generating and self-sustaining with the exception of the Department of Public Lands. All budget requirements for these entities are submitted under separate cover for informational purposes. Following is an illustration of how the budget was allocated between branches and activities.



# EXHIBIT G--MEDICAL CARE

The budget allocation illustrated below depicts 55% of the proposed FY 2015 will be expended in personnel, 41% for "all others" operational expenses, and 4% for utilities.



Of the total funds allocated for "all others", a large amount represents personnel costs of independent agencies treated as transfers such as the Marianas Visitors Authority, the Northern Marianas College, the Public School System, and the Commonwealth HealthCare Corporation.

# EXHIBIT G--MEDICAL CARE

Table 4 - Uses

| Government Activities Uses | | | | | |
|---|---|---|---|---|---|
| **Activities** | **Saipan** | **Tinian** | **Rota** | **Total** | **%** |
| Health[1] | 7,727,207 | 0 | 0 | 7,727,207 | 6% |
| Public Safety and Law Enforcement[2] | 13,618,218 | 1,059,087 | 1,064,671 | 15,741,976 | 11% |
| General Government[3] | 40,578,498 | 2,957,224 | 2,346,246 | 45,881,968 | 33% |
| Community and Social Services[4] | 2,322,459 | 246,351 | 192,691 | 2,761,501 | 2% |
| Other Elected Officials[5] | 1,763,544 | 48,859 | 63,284 | 1,875,687 | 1% |
| Utilities[6] | 4,572,637 | 465,136 | 465,136 | 5,502,909 | 4% |
| Public Works | 2,322,692 | 168,500 | 595,828 | 3,087,020 | 2% |
| Lands and Natural Resources | 2,376,620 | 446,183 | 639,351 | 3,462,154 | 3% |
| Legislative Branch[7] | 4,010,017 | 0 | 0 | 4,010,017 | 3% |
| Judicial Branch | 3,953,835 | 0 | 0 | 3,953,835 | 3% |
| Education[8] | 38,119,792 | 0 | 0 | 38,119,792 | 28% |
| Economic Development[9] | 2,055,868 | 111,379 | 135,512 | 2,302,759 | 2% |
| Autonomous Agencies (DPL) | 3,303,324 | 0 | 0 | 3,303,324 | 2% |
| **Total** | **126,724,711** | **5,502,719** | **5,502,719** | **137,730,149** | **100%** |

---

[1] Includes CHCC, Medicaid Reimbursement, Medicaid Administration, Medical Referral & Govt. Health Ins.

[2] Includes Attorney General's Office, Dept. of Corrections, Div. of Customs and Dept. of Public Safety.

[3] Includes Office of the Governor, Lt. Governor, Other Offices of Governor/Lt. Governor, Dept. of Finance, Dept. of Labor, First Senatorial District, Second Senatorial District, Third Senatorial District, Boards and Commission and Independent Programs.

[4] Includes Dept. of Community & Cultural Affairs, Public Libraries, Humanities Council, Ayuda Network, Domestic Violence, Marianas Bound-Karidat, Commonwealth Museum, Substance Abuse, NMASA, DDC CNMI Respite Service.

[5] Includes salaries and benefits of Governor, Lt. Governor, Mayors, Representatives and Senators.

[6] Includes all utilities for Saipan, Tinian and Rota.

[7] Excludes salaries of elected members of House and Senate.

[8] Includes allocation to the Northern Marianas College, Public School System and the CNMI Scholarship.

[9] Includes allocation of the Dept. of Commerce, Marianas Visitors Authority and Economic Development offices for Tinian and Rota.

# EXHIBIT G--MEDICAL CARE



## Settlement Fund

The allocation of $27 million to the Settlement Fund includes the minimum annual payment sufficient to enable the Settlement Fund to pay the 75% of Class Members Full Benefits.  In addition, the sum of $665,913 is allocated for all defined benefit (DB) members who opted to remain with the DB plan.  The remaining 25% of Class Members Full Benefits is earmarked as a separate contribution to the Settlement Fund pursuant to Public Laws 18-30 and 18-38.

A cost breakdown is reflected in the Table below:

| Branch | Settlement Trust | DB ER Share Active EE | TOTAL |
|---|---|---|---|
| Executive | 27,000,000 | 460,530 | 27,460,530 |
| Judicial | | | 0 |
| Legislative | | 205,383 | 205,383 |
| **TOTAL** | **27,000,000** | **665,913** | **27,665,913** |

**000014**

**Group Health and Life Insurance (GHLI)**
The sum of $1.0 million was allocated for the group health and life insurance specifically for active retirees. An estimated $4.5 million is earmarked as additional funding for the group health and life insurance pursuant to 4 CMC §1402(a)(16)).

**Defined Benefit Contribution**
The employer contribution rate for those current members that remain in the Defined Benefit Contribution Plan has been reinstated to 37.39% in this Budget Proposal. A total of 49 employees remain enrolled in the DB Plan of which 14 are from the Legislative Branch and 35 from the Executive Branch.

**Commonwealth Government Employees Credit Union (CGECU)**
The sum of $338,751 is allocated to return outstanding shares to CGECU members who have no outstanding loans.

**Medical Referral**
The allocation of the Patient Referral program in the general fund has been reduced to $1.0 million. Other revenue generating sources have been earmarked towards the program pursuant to Public Law 18-38 as amended by P.L. 18-43.

**Office of the Attorney General (Elected)**
House Legislative Initiative 17-2, HD3, HS2 establishes the Elected Office of the Attorney General as an Independent Agency under the Executive Branch. Only one quarter of the funds is allocated to the existing Office of the Attorney General in FY 2015 and three quarters to the Elected Office of the Attorney General. A specific provision in the proposed budget legislation should include the transition of all remaining unobligated funds and all number of positions authorized in the budget into the Elected Office of the Attorney General on the day the Elected Attorney is sworn into office.

**First and Second Senatorial Districts**
The Municipalities of Tinian and Rota received equal allocation for FY 2015. Utilities for both municipalities were equally allocated at $465k each under the assumption that both municipalities will implement measures towards energy savings as we deem this expense to be the greatest potential for reducing the government's cost.

**Commonwealth HealthCare Corporation (CHCC)**
With CHCC stabilizing in its control over its local revenue, the administration has included the sum of $2.0 million to help defray the cost of clinical services for the indigent population, medical care for the inmates from the Department of Corrections, and for the acquisition of medical equipment with the state of the art technology and software capable of monitoring

# EXHIBIT G--MEDICAL CARE

multiple vital signs of patients. This equipment will reduce errors, if not eliminate, data collected manually as the hospital transitions from a manual to a modern technology unit for monitoring vital signs, and thus, provide operational efficiency. Of the $2.0 million, $1,346,925 is allocated from the general fund and $653,075 from compact impact funds.

CHCC is encouraged to continue utilization of the certified public expenditures (CPE) methodology to generate $0.55 for every dollar spent on the cost of providing medical care; provided, however, CPE claims were cost-related to the Medicaid clientele.

Other funding needs of the hospital are being addressed outside of the general fund to be in compliance with the mandated requirements of the Center for Medicare/Medicaid Services. This includes the hospital ventilation and cooling (HVAC) system and the replace of the fire pumps. Both contracts have been executed with an estimated performance period of 300 days. Funds to pay for these two projects were made available as a result of a redirection from the Capital Improvement Program to address this critical need. Additional funding will continue to be provided in FY 2015 to address the needs of CHCC.

## Public School System

This proposal allocates $32,279,996 to the Public School System equivalent to 24% of the total general fund resources or 9% in excess of the constitutional mandate of 15%.   Of this allocation, the sum of $28,860,485 is to satisfy current actual salaries for the Public School System and $3,419,511 as maintenance of effort (MOE) allocation. The MOE allocation is to satisfy MOE obligations due to PSS for FY2010; and partially for FY 2011. The central government is committed to fulfilling its outstanding MOE obligation in FY 2016 in the amount of $1,738,940 for the PSS.   The PSS has the flexibility on how the application of the additional funding will be used, but we highly recommend the use of these funds to pay down amount owed to the Commonwealth Utilities Corporation for outstanding utilities.

In addition, the sum of $220,004 will be allocated to the PSS from Compact Impact funds and $700,000 from the Commonwealth Worker Fee Fund. The total allocation to PSS with the combined sources will amount to $33,200,000.

| Public School System | G/F | Compact Impact | CW | Total |
|---|---|---|---|---|
| Based on 2014 Actual | 28,860,485 | | | 28,860,485 |
| Maintenance of Effort: | | | | |
| FY 2010 | 103,840 | | | 103,840 |
| FY 2011 | 3,315,671 | | | 3,315,671 |
| Compact Impact | | 220,004 | | 220,004 |
| Commonwealth Worker Fund | | | 700,000 | 700,000 |
| | | | | |
| Total PSS 2015 | 32,279,996 | 220,004 | 700,000 | 33,200,000 |

# EXHIBIT G--MEDICAL CARE

**Northern Marianas College**

This proposal allocates the sum of $3,930,008 to the Northern Marianas College. Of this allocation, the sum of $315,192 is to satisfy MOE obligations due to NMC for FY 2010. The central government is committed to fulfill its outstanding MOE obligation in FY 2016 in the amount of $590,311 for the NMC. In addition to this proposed budget, the sum of $700,000 will be allocated to the NMC from the Commonwealth Worker Fee Fund and $86,762 from Compact Impact. The total allocation to the NMC with the combined sources will amount to $5,031,962.

| Northern Marianas College | G/F | Compact Impact | CW | Total |
|---|---|---|---|---|
| Based on 2014 Actual | 3,930,008 | | | 3,930,008 |
| Maintenance of Effort: | | | | |
| FY 2010 | 315,192 | | | 315,192 |
| FY 2011 | 0 | | | 0 |
| Compact Impact | | 86,762 | | 86,762 |
| Commonwealth Worker Fund | | | 700,000 | 700,000 |
| | | | | |
| Total NMC 2015 | 4,245,200 | 86,762 | 700,000 | 5,031,962 |

**Transition**

This proposal includes the transition of 12 NOPs from the Department of Public Works, Roads and Grounds Division into the Department of Lands and Natural Resources, Parks and Recreation. This is a result of the collaboration with the Destination Enhancement Committee to expand the beautification projects throughout the island and efforts to combine resources for maximum efficiency.

**Minimum Wage**

Included in this proposal is the implementation of the $0.50 minimum wage increase which becomes effective September 30, 2014. The impact on this budget proposal for the salary adjustments to a total of 189 employees is estimated at $220,000.

**Utilities**

We encourage each branch of government and each department and division to continue to be vigilant in energy conservation program necessary to help reduce our costs of utilities. With this measure in place, some of our central government agencies were already able to reduce their cost of utilities expense by more than 30%. The sum of $5.4 million allocated to utilities will defray utility consumption charges for Saipan, Tinian and Rota Municipalities, and the Judicial and Legislative Branches. Although utilities may be underfunded in its entirety, other sources may be available to supplement the shortfall with the enactment of new revenue generating legislation. The $5.4 million allocation excludes any utility allocation for the Public School System and the Northern Marianas College.

# EXHIBIT G--MEDICAL CARE

We request for the inclusion of a separate provision to restrict any funds to be reprogrammed from the utilities allocation similar to that of P.L. 18-18.

## Vacant and New Positions

We implemented the removal of all vacant positions not attached to an examination announcement and all new positions proposed by the various departments and activities in an effort to maintain normal government operations without forcing any reduction in hours. We would like to continue the inclusion for your consideration another 50 NOPs for the entire Executive Branch, which may be filled upon the Governor's approval, provided that the NOP shall be restricted to positions that are essential to the delivery of public services. No NOP shall receive compensation in excess of the government salary ceiling set forth in 1 CMC §8248, as amended, and as long as funding for the personnel expenditures of the Executive Branch does not exceed the appropriation level.

We request that a continued reprogramming flexibility be maintained to accommodate only those that may be faced with the most critical need.

## Travel

Travel restrictions will continue to be impose in FY 2015 using local funds. However, in the event that travel is necessary to be performed, the request must be approved by the Governor.

## Revenue Generation

It is critical that any and all revenue generating measures be considered and introduced expeditiously to meet the demands of providing public service to the Commonwealth. This effort will require close collaboration with the Administration, as well as the private sector, to ensure that we remain focused on resolving the issues that we all mutually face, as well as address and mitigate any concerns that may arise prior to implementation. Passage of PL18-30 Tourism Entertainment and Destination Enhancement Act of 2013 and PL 18-38 Exclusive Gaming License Act, as well as other revenue generating bills will increase the economic resources of the Commonwealth in FY 2015 and we anticipate submitting a supplemental budget to address the potential increases in revenues and addressing of operational needs of the Government at a later date.

**000018**

# EXHIBIT G--MEDICAL CARE

This submission fulfills the Executive Branch's primary responsibility as required by the Constitution. We are cognizant of the opportunity to submit amendments and revisions to this budget three months prior to the beginning of the fiscal year. We will continue to monitor events and fiscal conditions that might affect this budget and will submit changes and amendments as appropriate.

This budget submission has received the input and comments of the Mayors of Rota, Tinian and Aguigan, Saipan, and the Northern Islands, as well as that of the Executive Assistant for Carolinian Affairs. The Council members have reiterated their request for your consideration to allow some flexibility in reprogramming and their allocated number of positions for the fiscal year.

The Special Assistant for Management and Budget and the Secretary of Finance are available to discuss the details of this Proposed CNMI Budget for Fiscal Year 2015. Thank you and we look forward to working with you and the members in ensuring a timely passage of this proposal.

Sincerely,

**ELOY S. INOS**

cc: Lt. Governor
    Secretary of Finance
    Special Assistant for Management and Budget
    Special Assistant for Administration
    Special Assistant for Programs and Legislative Review
    All Mayors
    All Municipal Councils
    Executive Assistant for Carolinian Affairs
    Members of the 18th Legislature

## INMATE/DETAINEE ESCORT TRACKING FORM

Case 1:99-cv-00017   Document 65-1   Filed 04/30/14   Page 21 of 73
EXHIBIT G--MEDICAL CARE

000020

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ▮ | HORIGUICHI (FED. COURT) | 0800 | CO2. MALIYUAF D. | 1135 | CO1. LANIYO. A/SGT. CASTRO |
| | CHC | 0805 | CO1.AGULTO B/CO3.DLGUERRERO G. | 0942 | CO1. AGULTO. B |
| | CHC | 0805 | CO1.AGULTO B/CO3.DLGUERRERO S. | 0942 | CO1. AGULTO. B |
| | CHC | 0805 | CO1.AGULTO.B/CO3.DLGUERRERO.S. | 0942 | CO1. AGULTO. B. |
| | COURT | 1100 | CO2. LANIYO. ANTHONY | 1140 | CO1. LANIYO. ANTHONY |
| | COURT | 1100 | CO2. LANIYO, ANTHONY | 1140 | CO1. LANIYO. ANTHONY |
| | COURT | 1115 | SGT. CASTRO, JOSE | 1140 | CO1. LANIYO. ANTHONY |
| | HEMODIALYSIS | 1200 | CO2. WABOL, D. | 1712 | CO2 WABOL. D.C |
| | SIA | 1445 | SGT. CASTRO, J/SGT. QUITANO, M. | | |
| | CHC | 1735 | CO2 WABOL, D.C. | 2020 | CO2. WABOL. D.C. |

SHIFT COMMANDER: LT. QUINTANILLA, J.

DATE  APRIL 12. 2013

BOOKING OFFICER: CO2.SEMAN, MARVIN B. (MANPOWER)
&
SGT. QUITANO, MANUEL

Case 1:99-cv-00017    Document 65-1    Filed 04/30/14    Page 22 of 73

EXHIBIT G--MEDICAL CARE

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
**DEPARTMENT OF CORRECTIONS**
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

## INMATE/DETAINEE ESCORT TRACKING FORM

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ▮ | CHC | 0750 | COI. AGULTO, B. | 0834 | COI. AGULTO, B. |
| | JURY TRIAL | 0840 | COII. SABLAN, RYAN | 1045 | SGT. SABLAN, T. |
| | COURT. | 0840 | COII. SABLAN. RYAN | 1000 | COII. SABLAN. RYAN |
| | CHC | 1325 | COI. LANIYO, ANTHONY | 1415 | COI. LANIYO, ANTONY |
| | COURT | 1400 | COB. BILLY, F | 1453 | COI. LANIYO, ANTHONY |
| | JURY TRIAL | 1455 | SGT. SABLAN, T. | 1000 | SGT. SABLAN, T. |
| | COURT | 1589 | COI. LANIYO, ANTHONY | 1557 | COI. LANIYO, ANTHONY |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

000021

SHIFT COMMANDER: LT. Quintanilla, J.

DATE: APRIL 11, 2013

BOOKING OFFICER: COII. SEMAN, MARVIN B
&
SGT. QUITANO, MANUEL

EXHIBIT G--MEDICAL CARE

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
**DEPARTMENT OF CORRECTIONS**
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

## INMATE/DETAINEE ESCORT TRACKING FORM

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ███████ | COURT | 0845 | COR. CAMACHO, J / COR. SEGOTHER, R | 0950 | COR. CAMACHO, J |
| | COURT | 0845 | COII. CAMACHO J / COR. SEGOTIER, R | 1045 | COR. CAMACHO, J |
| | COURT | 0845 | COII. CAMACHO, J / COII. SEGOTIER, R | 0950 | COR. CAMACHO. J |
| | COURT | 0845 | COII. CAMACHO, J / COII. SEGOTIER, R | 0950 | COR. CAMACHO J |
| | COURT | 0845 | COII. CAMACHO, J / COII SEGOTIER, R | 1045 | COR. SEGOTIER, R |
| | COURT | 0845 | COII. CAMACHO J / COII SEGOTIER, R | 1045 | COR. SEGOTIER, R |
| | COURT | 0845 | COII. CAMACHO J / COII. SEGOTIER, R | 1045 | COR. SEGOTIER, R |
| | COURT | 0845 | COII. CAMACHO J / COII. SEGOTIER, R | 1045 | COR. SEGOTIER, R |
| | COURT | 0845 | COII. CAMACHO, J / COII SEGOTIER, R | 0950 | COR. CAMACHO, J |
| | COURT | 0845 | COII. CAMACHO, J / COII SEGOTIER, R | 1045 | COR. SEGOTIER, R |
| | COURT | 0845 | COII. CAMACHO, J / COII. SEGOTIER, R | 0950 | COR. CAMACHO, J |
| | COURT | 0845 | COII. CAMACHO, J / COII SEGOTIER, R | 0950 | COR. CAMACHO J |
| | COURT | 0845 0900 | SGT. SABLAN, T | 1235 | SGT. SABLAN, T. |
| | COURT (NO WRIT) | CANCEL | CANCEL | CANCEL | CANCEL |
| | COURT | 1000 | COB. BABAUTA, KEVIN Q. | 1050 | C.O. BABAUTA KEVIN |
| | HEMODIALYSIS | 1225 | COR. EVANGELISTA, G / COR. WADA, DC | 1740 | COS. BILLY. F |
| | CHC | 1225 | COR. EVANGELISTA, G / COR. WADA, DC | 1740 | |
| | JURY TRIAL | 1330 | SGT. SABLAN, T. | 1630 | SGT. T. Sablan |
| | COURT | 1330 | SGT. SABLAN T | 1545 | COB. BILLY, F |
| | COURT | 1330 | SGT. SABLAN T. | 1545 | COB. BILLY, F |

SHIFT COMMANDER: LT. JM Quintalira        Booking ofr: CO3. K. Babauta        DATE: 4/10/12

Case 1:99-cv-00017  Document 65-1  Filed 04/30/14  Page 24 of 73

EXHIBIT G--MEDICAL CARE

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
**DEPARTMENT OF CORRECTIONS**
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

**INMATE/DETAINEE ESCORT TRACKING FORM**

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ███ | JURY TRIAL COURT | 0815 | Sgt. T. Sablan. | 1019 | SGT. SABLAN, T. |
|  | CANCELLED |  |  |  |  |
|  | court | 1000 | COR. Aldan, Candido | 11:00 | COR. Aldan, CANDIDO |
|  | Hospital | 1240 | COI. Taregeyo, R. | 1620 | COI. Taregeyo, R/COR. Aldan, C. |
|  | Hospital | 1240 | COI. Taregeyo, R. | 1620 | COI. Taregeyo, R/COR. Aldan, C. |
|  | JURY TRIAL | 1315 | SGT. SABLAN, T. /COR. Peter | 1620 1710 | SGT. T. Sablan |
|  | court | 1315 | SGT. T. Sablan /COR. peter | 1520. | COR Peter, B. |
|  | court | 1315 | SGT. Sablan, T. /COR. peter | 1510 | COR. Peter, B. |
|  | court | 1315 | SGT. Sablan, T. /COR. peter | 1510 | COR. Peter, B. |
|  | court | 1815 | SGT. T. Sablan. /COR. peter | 1510 | COR. Peter, B. |
|  | MHC | 1800 | COR. Kaipat. Ryhm. |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

SHIFT COMMANDER: LT. JM Quintalling

Booking ofcr: COR. Kabakaufa
SGT. Quitano, Manual. CRO

DATE: 4/9/13.

000023

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
DEPARTMENT OF CORRECTIONS
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

INMATE/DETAINEE ESCORT TRACKING FORM

EXHIBIT G--MEDICAL CARE

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ██████████ | CHC | 0735 | COR. Cruz. A / COR. Saeran. R | 0900 | COR. A. CRUZ |
| | CHC | 0735 | COR. Cruz. A / COR. Saeran. R | 0900 | " " " |
| | COURT | 0835 | COR. ALDAN, C. | 0835 0935 | COR. NORITA. S. |
| | JURY TRIAL | 0885 | COR. ALDAN. C | 1200 | COR Aldan. C |
| | COURT | 0885 | COR. ALDAN. C | 0935 | COR. NORITA, C. |
| | COURT | 0925 | SGT. QUITANO, M. | 1041 | SGT. M. [illegible] |
| | Chc (Hemo, Dialysis) | 1236 | Sgt. Anseau. Jose | 1750 | COR. WABOL, D.C. |
| | Curt | 1310 | Sgt Saedan. F / Sgt Quitano, M | 1428 | COR. Saedan, Yindc |
| | Curt | 1300 | Sgt Saedan. F / Sgt Quitano, M | 1345 | COR. Turagexo, R. |
| | ⌐ | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SHIFT COMMANDER: LT. QUINTANILLA, J.M.

DATE: 04-08-13

000024

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
DEPARTMENT OF CORRECTIONS
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

## INMATE/DETAINEE ESCORT TRACKING FORM

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ███████ | HORIGUICHI (FED. COURT) | 0730 | SGT. QUITANO / SGT. Maanao | 1130 | SGT. Maanao |
| ███████ | HORIGUICHI (FED. COURT) | 0730 | SGT. QUITANO / SGT. MAANAO | 1130 | SGT. Maanao |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SHIFT COMMANDER: LT. QUINTANILLA, JM

DATE: 03 - 22 - 13

000025

EXHIBIT G--MEDICAL CARE

Case 1:99-cv-00017   Document 65-1   Filed 04/30/14   Page 27 of 73

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
**DEPARTMENT OF CORRECTIONS**
VICENTE T. SEMAN BUILDING P.O. BOX 506506 CK, SAIPAN MP 96950

**INMATE/DETAINEE ESCORT TRACKING FORM**

| INMATE NAME | DESTINATION | TIME-OUT | SIGNED OUT BY | TIME-IN | SIGNED IN BY |
|---|---|---|---|---|---|
| ▊ | CHC | 0856 | COl. M. CRUZ | 1010 | COl. CRUZ, MAX |
| ▊ | COURT (JURY TRIAL) | 0810 | SGT. CASTRO, J /COR. KANESHI | 1210 | COR. KANESHI, D. |
| ▊ | COURT | 1420 | SGT. CASTRO, J | 1605 | COR. KANESH, D. |
| ▊ | CHC | 1410 | COl. CRUZ, M. | 1655 | COl. CRUZ, MAX |
| ▊ | COURT (JURY TRIAL) | 1305 | COR. KANESHI, D | 1605 | COR. KANESHI, D. |
| ▊ | COURT | 1420 | SGT. CASTRO, J | 1605 | COR. KANESHI, D. |
| ▊ | COURT (JURY TRIAL) | 1730 | COR. KANESHI, D, | 1805 | COR. KANESH, D. |
| ▊ | CHC | 1752 | COP. CRUZ, M. | 1930 | COl. CRUZ, MAX |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

000026

SHIFT COMMANDER: LT. QUITANILLA, J

DATE: 08/21/13

BK OFCR: COR. SABLAN, JOAQUIN C. JR.

# EXHIBIT G--MEDICAL CARE



## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

### DEPARTMENT OF CORRECTIONS
Vicente Taman Seman Building
P.O. Box 506506, Saipan, MP 96950
Telephone: (670) 664-9061 Facsimile: (670) 664-9515



| Part | Section | Subject | Policy No. | Review Date |
|---|---|---|---|---|
| Institutional Services | Reception and Orientation | Booking Procedure | 4.1.3 | |
| ACA Standards | 3-ALDF: 1F-07 Inmate/Detainee Booking; 4A-02 Admission and Orientation of New Inmates/Detainee; 4A-03 Inmates/Detainees are separated from General Population during admission; 4A-04 Itemized inventory of personal property during admission; 4B-01 Initial Classification to determine housing assignment; 4A-01 Health Screening and Examination; 3A-08 Male and Female officer required when same gender are in a housing unit. | | | |
| Consent Decree | Paragraph 54 Develop Facility Policies and Procedures | | | |

## I.    PURPOSE

To describe the procedures that will be used to admit inmates/detainees into the facility.

## II.    POLICY

It is the policy of the Department of Corrections (DOC) to properly admit and process inmates/detainees into the facility by ensuring that the person is legally committed, accurate identification information is obtained, and to classify the inmate/detainee accordingly to maintain the facility's security.

## III.    PROCEDURES

Only Booking/Release officers are authorized to book or release an inmate/detainee in or out of the facility. The Booking/Release area is the designated area for all processing inmates/detainees that are to be booked and/or released. No person shall be detained in the holding cells, detention cells and the padded room for more than eight hours. The Booking/Release area shall be staffed twenty-four hours a day and have the following readily available:

- Secure holding cells for inmates/detainees being processed, with sitting capacity of the holding cell.
- Drinking water available on site.
- Shower and toilets.
- Property storage for inmates/detainees property.
- Telephone for inmates/detainees to make legal or other calls upon initial confinement.
- Computers for Booking/Release process.
- Sally port entrance to ensure security and safety.

# EXHIBIT G--MEDICAL CARE

## A. Initial Processing

1. Any arresting agency to drop off any person for confinement, must first secure their firearms in the gun lockers located in the vehicle sally port prior to entering the intake entrance into the Booking/Release area. The Booking/Release officer will properly identify the transporting officer before admitting the officer and his/her arrestee into the main entrance. In the event that the transporting officer fails to provide any identification or credential requested by the Booking/Release officer, he/she may be denied entry.

2. If the inmate or detainee is being transferred from another facility, the Booking/Release officer will obtain any file or medical record from the transporting officer.

3. Persons with injury will not be accepted. The transporting officer will be informed that medical attention is to be provided prior to the person being confined. Medical form and/or report must be provided from the attending physician stating that the person has been examined and/or treated and is fit for detention. Any form and/or report obtained will be attached to the booking forms for record and filing. If the person to be confined shows clear signs of mental illness, he/she will not be taken to CHC for evaluation.

4. The transporting officer is required to log all necessary information pertaining to the person to be confined. He/she is also required to furnish any legal documents such as court order, arrest warrant, parole or probation revocation warrant, immigration warrant, federal detainer, or judgment and commitment order if any. The Booking/Release officer will then verify to ensure the legality of the document and for any discrepancy; the Booking/Release officer will then sign any detainer forms or receipts and retain a copy for file. A registered booking number will be assigned for each person that is booked.

5. Upon obtaining all needed information and any legal documents, the Booking/Release officer will then conduct a preliminary search.

6. The Booking/Release officer will ensure that no person under the age of eighteen is committed unless the person is committed with a court order.

7. Constant supervision will be conducted to all inmates/detainees being housed in the holding cell who are awaiting booking and classification.

## B. Admission of Uncooperative Individuals

1. Any person brought in for confinement and is under the influence of drug and/or alcohol will be searched thoroughly then will be housed in the holding cell, constant and direct supervision will be maintained at all times to ensure the individual's safety.

2. In the event that the person becomes too aggressive and possibilities are that he/she may hurt them self intentionally, he/she will be transferred to the padded

2

room to minimize any injury. Constant supervision will be conducted to any person being placed in the padded room.

3. In the event that a restraining device is needed for an aggressive person, the shift commander will assess the situation and make the final decision. In the event that restraining device is applied, a log entry will be required as well as an incident report. Constant supervision will be applied to the person in restraints, and shall not be restrained for more than is necessary.

4. The person will be transferred back to the holding cell when he/she becomes less aggressive and shows signs of normal behavior.

## C. Court Commitment Orders

1. To ensure that no citizen is detained unlawfully, no individual will be accepted into custody without documented legal authority.

2. Individuals sentenced by the court must provide a commitment order and a legal identification prior to acceptance into custody.

3. No juvenile will be accepted into custody unless it is a court issued order.

4. Initial process applies to all court commitment orders. Any person is required to go through the formal booking process when committed by the court.

## D. Acceptance of Custody

1. The Booking/Release officer will safely and securely accept custody of individuals once proper authority, valid documents and medical clearance have been established. All restraining devices will be returned to the transporting/arresting agency.

2. Individuals with court commitment orders will be accepted when commitment order and legal identification are produced.

3. Any person detained under probable cause arrest, criminal/civil warrants, bench warrant, immigration warrant, probation/parole warrants and federal detainer are required to undergo a Rule 5 hear (Initial Appearance with the court.)

## E. Searches

1. Thorough searches are very critical to ensure the safety and security of the facility.

2. Initial search will be conducted in the search/transfer room.

3. The Booking/Release officer will instruct the individual to remove all personal property on him/her, including outer wear such as cap, coat, gloves, shoes, belt, and/or jewelry, etc.

4. The Booking/Release officer will search the individual using a hand-held metal detector. Any object detected will be removed and searched thoroughly.

5. After searching the individual with a hand-held metal detector, a pat-down search will be conducted.

6. Upon completion of both searches, the Booking/Release officer will then conduct a strip search on the individual for any contraband, weapon, tattoos and/or injury.

7. Any contraband or weapon found on the individual will be confiscated for evidence or disposal.

8. Confiscated property shall be documented stating the disposition of the property, if contraband is to be disposed, another officer will witness the contraband to be disposed.

9. Before proceeding to the booking process, the individual will be searched by a walk through metal detector.

## F. Booking

1. When processing inmates/detainees, there must be at least two officers involved. Should an additional officer be needed, the duty officer must request from the Booking/Release Sergeant for assistance.

2. The Booking/Release officer will complete all booking form by asking the individual biographical questions and other pertinent information.

3. In the event that the individual cannot be booked due to language barrier, the Booking/Release officer will notify the Booking/Release Sergeant of the situation.

4. The Booking/Release Sergeant must seek the assistance of various government agencies for a designated translator—government agencies such as the Department of Public Safety, the Immigration Division, Office of the Attorney General, the Superior Court, and/or any other agency.

## G. Photograph and Fingerprints

1. Identification is a critical part of the booking process. All newly admitted individuals will be photographed from the front and side view positions.

2. All distinguishing marks will be photographed and recorded.

3. A complete set of fingerprints will be taken using a fingerprint card. The fingerprints must be clear and legible, and the form must be accurately filled-in and signed by both, the person being fingerprinted and the Booking/Release officer taking the fingerprints.

4

**H. Other Identifiers**

Identifying marks and/or unusual physical characteristics will be recorded, which will include, but not limited to, height, weight, visual examination of scars, notation of physical deformities, and description of any tattoos.

**I. Personal Property**

1. The Booking/Release officer and the inmate/detainee will jointly inventory all personal property.

2. All personal properties will be recorded on the Personal Property form describing each item in detail.

3. The inmate/detainee will initial his/her name on each property recorded that will be kept for storage.

4. A copy of the Personal Property form will be given to the inmate/detainee as a receipt.

5. Perishable food items and open beverage will be disposed.

6. Any individual to be detained for more than 24 hours will be informed of personal properties authorized in the facility. Arrangements will be made for all other personal properties to be returned to the individual's family member.

7. For inmate/detainee property storage, refer to policy on Inmate/Detainee Property Storage.

**J. Medical Screening**

1. All individual admitted into the facility to be detained will under-go a mandatory health screening.

2. If an inmate/detainee has any medical problem such as heart disease, diabetes, epilepsy, communicable disease, HIV positive, pregnancy, or any chronic, potentially life-threatening illness, he/she must be referred to the DOC nurse and/or the Commonwealth Health Center (CHC).

3. Any inmate/detainee known to have or discover to have any communicable disease will be examined immediately by the Department of Corrections (DOC) nurse or be taken to Commonwealth Health Center (CHC).

4. Any inmate/detainee with mental illness will be referred to the Staff Psychiatrist to determine type of treatment.

5. New inmate/detainee will be separated from the general population until completion of all medical screening.

5

**000031**

# EXHIBIT G--MEDICAL CARE

6.  All medical and mental health records are confidential; all will be filed separately, and will be stored in a DOC Nurse's Office. Only the Commissioner of Corrections and/or the Director of Corrections may authorize release of any medical information, with the written consent of the inmate/detainee.

## K. Notification

1.  A written entry shall be made on the routine log sheet as to the name of the standby representative notified, date and time informed and what actions are to be taken on the individual.

2.  If the standby representative does not respond or cannot be located, every effort will be made to contact someone from the arresting agency.

3.  All attempts made to contact a representative from the arresting agency will be recorded on the Routine Log Sheet.

4.  Individuals who are not afforded a Rule 5 Initial Appearance within twenty-four (24) hours, will be released from custody after all attempts have been made to notify the arresting agency.

## L. Initial Classification

1.  Any inmate/detainee to be moved into any housing unit must be classified prior to being moved into any housing unit.

2.  Classification will determine custody level and housing assignment.

3.  Inmates/Detainees will be separated from the general population until the classification process has been completed. They will be held in the designated intake area, or special housing if indicated by the initial classification process.

4.  All classification forms will be properly and completely filled-in.

5.  Refer to Classification Policy and Procedure.

## M. Visitation List

1.  Inmates/Detainees are encouraged to visit with family members and friends.
2.  Each inmate/detainee is required to submit a list of possible visitors.

3.  The list will be reviewed by the Classification Section for recommendation and approved by the Director.

4.  The inmate/detainee and visitor will be notified when visitation request is approved. Visitors not approved will be notified of the reasons for non-approval and will not be allowed to enter the facility.

5. Visitors denied visitation may submit reasons for approval to the Director for reconsideration. If the potential visitor is not satisfied with the Director's decision, the visitor may appeal the decision to the Commissioner.

## N. Inmate/Detainee Orientation

1. The Booking/Release officer will conduct orientation on all admitted.

2. Explain DOC rules and regulation using the inmate handbook.

3. List available programs and eligibility criteria.

4. Explain any testing and examination that are required.

5. Provide a copy of the inmate/detainee handbook. A form will be signed by the inmate/detainee attesting that orientation was conducted.

6. Refer to the Inmate/Detainee Orientation policy and procedure.

## O. Phone Calls

1. After completion of the booking process, newly arrested individuals may make necessary phone calls under the supervision of the Booking/Release Officer.

2. These calls may be made from the telephone in the Booking/Release Area. A telephone directory will be provided.

3. These calls may be made to an attorney, employer, relative, friend, or to another person that is arranging his/her bail.

4. At no time will the individual be permitted to call victims and/or witnesses involved.

5. All phone calls except attorney call made by the individual will be recorded through the inmate/detainee telephone system.

## P. Issuance of Clothing for New Commitments

1. Individuals that will be detained for more than eight (8) hours will be issued clothing.

2. Clothing issued will consist of three T-shirts, three pants, three pairs of socks, one pair of slipper, and three brassieres for females

3. All items issued will be recorded on the Supply Issuance Sheet and attached to his/her file.

**EXHIBIT G--MEDICAL CARE**

**Q.  Personal Hygiene**

1.  Individuals detained for more than eight (8) hours will be issued personal hygiene supplies.

2.  Personal hygiene supplies will consist of one toothbrush, one tube of toothpaste, one bar of body soap, one bottle of shampoo, one washrags, one razor, sanitary napkins for females, and two towels.

3.  All items issued will be recorded on the Supply Issuance Sheet and attached to his/her file.

**R.  Release of Inmate/Detainee**

1.  When the inmate/detainee is to be released from custody, all of his/her personal property kept in storage must be returned.

2.  The inmate/detainee will acknowledge receipt of his/her property by signing off on the Personal Property Sheet and must be attached back to his/her file.

3.  The date and time of release must be entered in his/her Personal Property Sheet.

4.  Prior to releasing the inmate/detainee from custody, the Booking/Release officer will review all documents relating to the inmate/detainee, including court documents to ensure that the inmate/detainee is being released in accordance to the condition of the court, and the rules and regulation of the DOC.

5.  The Booking/Release Sergeant will review all documents to ensure that all forms are filled-in properly, all property of the inmate/detainee is accounted for and returned, and the commitment order with respect to the length of incarceration is completed.

Reviewed By: _____     _____
Gregory F. Castro                                                                Date
Director of Corrections

Approved By: _____     12/17/07
Lino S. Tenorio                                                                    Date
Commissioner of Corrections

# EXHIBIT G--MEDICAL CARE

## MEDICAL SCREENING FORM

SELECTED FILTER: BOOKING NUMBER(S):

INMATE NAME:                                                              BOOKING #:

SEX:          RACE:                    D.O.B.:              SSN:                JAIL ID:

### OFFICER OBSERVATION

1  N  IS THE INMATE UNCONCIOUS?
2  N  DOES THE INMATE HAVE VISIBLE SIGNS OF TRAUMA, OR IN OBVIOUS PAIN?
3  N  IS THERE EVIDENCE OF INFECTION THAT MIGHT SPREAD THROUGH THE JAIL?
4  N  IS THERE A SKIN CONDITION SUCH AS RASHES, BRUISES, LESIONS, OR INFECTIONS?
5  N  DOES THE INMATE APPEAR TO BE UNDER THE INFLUENCE OF ALCOHOL AND/OR DRUGS?
6  N  ARE THERE NEEDLE MARKS OR OTHER INDICATIONS OF DRUG ABUSE?
7  N  IS THERE ANY BLEEDING, JAUNDICE, TREMORS, SWEATING, OR PERSISTANT COUGH?
8  N  DOES THE INMATE HAVE EASE OF MOVEMENT, AND/OR VISIBLE BODY DEFORMITIES?
9  N  DOES THE INMATE APPEAR TO HAVE A MENTAL CONDITION OR MENTAL RETARDATION?
10 N  DOES THE INMATE'S BEHAVIOR SUGGEST THE RISK OF SUICIDE OR ASSUALT ON OTHERS?
11 N  IS THE INMATE EXHIBITING ASSUALTIVE, VIOLENT, LOUD, OR OBNOXIOUS BEHAVIOR?

### INMATE QUESTIONNAIRE

1  N  COMMUNICABLE DISEASE?
2  N  SEXUALLY TRANSMITTED DISEASE (STD)?
3  N  AIDS, HIV?
4  N  ALCOHOL ADDICTION?
5  N  DRUG ADDICTION?
6  N  ALLERGIES?
7  N  ASTHMA
8  N  ARTHRITIS?
9  N  TUBERCULOSIS?
10 N  BACK PROBLEM?
11 N  DIABETES?
12 N  EMPHYSEMA OR SHORTNESS OF BREATH?
13 N  EPILEPSY OR SEIZURES?
14 N  HEART DISEASE?
15 N  HIGH BLOOD PRESSURE?
16 N  HEPATITIS?
17 N  HERNIA?
18 N  ULCERS OR STOMACH PROBLEMS?
19 N  DENTAL PROBLEMS?
20 N  VISION OR HEARING DIFFICULTIES?
21 N  PHYSICAL HANDICAP?
22 N  OTHER MEDICAL PROBLEMS?

### SUICIDE

1.  N  HAVE YOU EVER ATTEMPTED SUICIDE? WHEN? WHY? HOW?
2.  N  HAVE YOU EVER CONSIDERED SUICIDE? WHEN? WHY?
3.  N  ARE YOU NOW, OR HAVE YOU EVER BEEN TREATED FOR MENTAL HEALTH OR EMOTIONAL PROBLEMS?
4.  N  HAVE YOU RECENTLY EXPECIENCED A SIGNIFCANT LOSS?
5.  N  HAS A FAMILY MEMBER OR CLOSE FRIEND EVER ATTEMPTED OR COMMITTED SUICIDE?
6.  N  DO YOU FEEL LIKE THERE IS NOTHING TO LOOK FORWARD TO IN THE IMMEDIATE FUTURE?
7.  N  ARE YOU THINKING OF KILLING YOURSELF?
8.     GENERAL POPULATION?
9.     OBSERVATION?
10.    RELEASE?
11.    TRANSFER?
12.    REFERRAL?

### COMMENTS

### SUICIDE COMMENT

**000035**

**EXHIBIT G--MEDICAL CARE**

RUN DATE:                                                                                                    DEPARTMENT OF CORRECTIONS
RUN TIME:

MEDICAL SCREENING FORM

SELECTED FILTER: BOOKING NUMBER(S): 110553

<u>DRUG USE:</u>

TYPE OF DRUG:
LAST USED:
AMOUNT USED:
FREQUENCY:
MODE OF USE:
HISTORY:

<u>MEDICAL</u>

BOOKING #    BOOKING DATE    BOOKING TIME    RELEASE DATE

1. DOCTOR'S NAME:
2. DOCTOR'S ADDRESS:
3. MEDICAL
4. TAKING ANY MEDICATION:
5. SPECIAL DIET:
6. INJURIES/MARKS:
7. DEFORMITIES:
8. SPECIAL CARE:
9. SPECIAL DEVICES:
10. OTHER MEDICAL

MEDICAL INSURANCE:                                                    PERSONAL DOCTOR:
EMERGENCY CONTACT:
ADDRESS:
CITY:                          STATE:          ZIP:                    PHONE:

I CERTIFY THAT I HAVE TRUTHFULLY ANSWERED THESE QUESTIONS ABOUT MY HEALTH.

INMATE SIGNATURE:                                        DATE:                TIME:

OFFICER SIGNATURE:                                       DATE:                TIME:

MEDICAL STAFF:                                           DATE:                TIME:

**000036**

# EXHIBIT G--MEDICAL CARE

**KAGMAN JUVENILE DETENTION & CORRECTIONAL FACILITY**
**POLICIES AND PROCEDURES MANUAL**
SECTION VII
OPERATIONS

---

TOPIC**: MEDICAL CLEARANCE**                                POLICY STATEMENT NO: 7.02

DATE ORIGINATED: 4/03                                        PAGE 1 OF 3

REVISED:

---

## I. PURPOSE

To establish mandatory procedures for the Medical Clearance Screening of identified minors prior to booking.

## II. POLICY

A.    Intake/Reception Duty Officer, prior to accepting any minor for booking shall administer a medical intake screening (medical clearance).

B.    Non·medica1 facility employees will be trained in the use of the screening form. This training will be provided by a licensed medical health care professional and documented in the employee's personnel file.

C.    Minors determined not suitable for admission to the Kagman Juvenile Detention and Correctional Facility shall be transported to the Community Health Center Emergency Room by the delivering officer for clearance.

D.    A professional health care provider must screen minors taking prescribed medications as soon as the booking process has been completed. This screening may be accomplished over the telephone by contacting the prescribing physician. Such contact shall be documented with the name of the physician, the date and time.

E.    If the minor states a need for the prescribed medication prior to screening by the prescribing physician the Juvenile Correction Officer III shall contact the on duty Emergency Room Physician for advice and/or clearance. Such contact shall be documented with the name of the physician, the date and time.

## III. PROCEDURE

A.    Kagman Juvenile Detention and Correctional Facility administrative staff shall coordinate with the contract medical provider to develop policies and procedures defining the need for health evaluation and/or treatment prior to acceptance of a minor into the facility.

**000037**

# EXHIBIT G--MEDICAL CARE

B.      When a police office, Juvenile Probation Officer, or transporting officer brings a minor to facility for booking, the officer must have the minor medically screened and must provide written medical clearance before the minor may be booked if the minor exhibits any of the following symptoms:

    (1)     The minor is or was unconscious at any time during or after the incident for which the minor was taken into custody.
    (2)     The minor suffered a seizure or convulsion at any time during or after the incident for which the minor was taken into custody.
    (3)     The minor attempted suicide during or after the incident for which the minor was taken into custody.
    (4)     The minor exhibits symptoms of being under the influence of alcohol or controlled substances, or the minor admits use of alcohol or controlled substances immediately prior to being taken into custody.
    (5)     The minor has any unexplained bleeding.
    (6)     The minor has any head injury or wounds indicating the possibility of broken bone(s) or need for sutures.
    (7)     The minor is in the last trimester of pregnancy, indicates any problems related to pregnancy, or admits using controlled substances while pregnant.
    (8)     The minor exhibits any symptoms such as fever, breathing difficulty, rash, skin lesions, cough, vomiting, dizziness, persistent pain, or other symptoms indicative of serious illness, injury, or contagious condition.
    (9)     The minor has incoherent speech and/or is acting in a bizarre manner.
    (10)    The judgment of the Juvenile Correction Officer HI indicates the minor is n neeo of medical clearance before being accepted for booking.

C.      When a medical clearance is required before a minor will be accepted into the facility, the Intake/Reception Duty Officer shall document on the Intake Health Screening Form that the medical clearance was required and the circumstances and reasons for requiring a medical clearance.

D.      A medical clearance may be accepted from any certified medical facility or licensed medical health care provider. In most cases, medical clearance shall be obtained at the Community Health Center, which shall maintain established standards and criteria in cooperation with the contract medical provider. Standards and criteria shall be consistent with the facility's resources to hold the minor safely.

E.      If a medical clearance was obtained at any medical facility (including CHC) or by any other health care professional, the Juvenile Correction Officer III shall direct the transporting officer to take the minor to CHC for a second medical clearance if the Juvenile Correction Officer III has reason to believe the minor's medical condition cannot reasonably be handled in the facility. The Shift Supervisor shall telephone the CHC Emergency Room and advise staff on duty of the limitations of the facility as they relate to the minor's medical needs.

**000038**

# EXHIBIT G--MEDICAL CARE

F.      If a minor has received a medical clearance that includes any restrictions that are not reasonably possible (such as indicating that the minor should be housed in an infirmary), the Juvenile Correction Officer III shall direct the transporting officer to return the minor the provider of the medical clearance for additional review. The Shih Supervisor shall telephone the provider and advise staff on duty of the limitations of the facility as they relate to the minor's medical condition.

G.      If a minor has received a second medical clearance pursuant to the previous sections of this Manual, and the Shift Supervisor still believes the minor's medical condition is not stable enough for the facility, the Shift Supervisor shall contact the Facility Supervisor and request additional medical evaluation.

H.      If the Court remands a minor who is exhibiting any of the conditions listed in this Policy Statement **III B 1-10** facility staff shall assume responsibility for the minor and have the minor medically evaluated at the Community Health Center or other contract medical service provider as soon as reasonably possible after the minor's arrival at the facility.

I.      If a minor voluntarily surrenders himself/herself to the Kagman Juvenile Detention and Correctional Facility based on a Court order, and the minor exhibits any of the conditions listed in this Policy Statement **III B l-10** the Intake/Reception Duty Officer shall cause the minor to be transported to the Community Health Center for medical clearance, and shall document the incident and results of the medical screening in a Special Incident Report. The Intake/Reception Duty Officer shall immediately send a copy of the Special Incident Report to the Juvenile Probation Officer assigned to supervise the minor.

      (1)      lf the minor does not obtain a medical clearance, Intake/Reception Duty Officer shall direct the minor's parent/guardian's to take him/her home and contact the Juvenile Probation Officer assigned to supervise the minor as soon as possible for a modification of the Court order.

      (2)      If the minor docs obtain a medical clearance, the Intake/Reception Duty Officer shall accept the minor for the voluntary remand. lf the minor has alcohol and/or controlled substances in his/her system, the Intake/Reception Duty Officer shall refer the matte to the Juvenile Probation Officer assigned to supervise the minor for possible violation of probation proceedings.

J.      Any minor who is admitted to the Kagman Juvenile Detention and Correctional Facility after a medical clearance shall be referred to be medical personnel (sick call). The medical clearance shall be presented to medical personnel who may see the minor subsequent to admission.

**000039**

# EXHIBIT G--MEDICAL CARE

**KAGMAN JUVENILE DETENTION & CORRECTIONAL FACILITY**
**POLICIES AND PROCEDURES MANUAL**
SECTION VII
OPERATIONS

---

TOPIC: **HEALTH SCREENNG**                                    POLICY STATEMENT NO: 7.06
      **MENTAL HEALTH SCREENING**
DATE ORIGINATED: 4/03                                          PAGE I OF 1

REVISED

---

## I. PURPOSE

To provide the staff members of the Kagman Juvenile Detention and Correctional Facility with a systematic method of evaluating the medical and/or Mental Health needs of new detainees.

## II. POLICY

During the booking process, Intake/Reception Duty Officers shall screen all minors for potential health and Mental Health problems.

## III. PROCEDURE
The intake screening shall consist of at least the following: I

A.     Observe the minor for injuries, behaviors, and other symptoms of health and/or mental health problems.

B.     Staff shall use the Intake Health Screening form as a guideline for observations, and record the observations in the appropriate logs and files.

C.     Ask the minor the questions on the Intake Health Screening Form and record his/her answers.

D.     Staff shall continue the questioning with the Initial Screening Assessment, record the minor's answers, and sign the form. The Juvenile Correction Officer III shall review and sign the Initial Screening Assessment also.

E.     The Juvenile Correction Officer III shall use this information in conjunction with the Classification Assessment to properly place the minor according to any special needs. Refer to Policy Statement 4.20.

F.     Refer the minor for medical and/or mental health treatment immediately if there is evidence of communicable diseases or other conditions that should not wait until the next sick call or required intake physical.

G.     Provide a copy of the Intake Health Screening form and the Initial Screening Assessment to the medical professional and/or the mental health professional who interviews the minor.

**000040**




**EXHIBIT G: MEDICAL CARE**
Kagman Juvenile Detention & Correctional Facility
P.O. Box 501000 CK Saipan, MP 96950
Tel.: (670) 256-2550
Fax: (670) 256-2558

# ADMISSION FORM

JDU Booking No.:_____ JPU Intake No.: _____ DPS/Court Case No.: _____

Date/Time of Admission: _____ m/d/y  Date/Time of Arrest:_____ 24 Hrs. Time

Arresting Officer:_____

Minor's Full Name: _____ Sex: ☐ M ☐ F   SS#: _____
                     Last        First        M.I.

DOB: _____ (M/D/Y)  Age: _____   Res.:_____

Religious Pref:_____   Ethnic: _____   Citizen: _____

---

Height: _____' _____"   Hair Color         Eye Color              Distinguish Marks
                    Black ☐    Grey ☐   Black ☐   Green ☐   _____

Weight: _____lbs.  Brown ☐    Red ☐    Blue ☐    Gray ☐   _____

                    Blonde ☐            Brown ☐   Hazel ☐   _____

---

Attending School: ☐ Yes  ☐ No  If yes, name of School: _____   Highest Grade Completed: _____

---

Detained Before ? ☐ Yes ☐ No   If yes, indicate most recent date detained: _____ (M/D/Y)

Current DYS Client?   Yes ☐ No  If yes, what Unit?: ☐ Juv. Probation Unit   **ASSIGNED CASEWORKER**
                                                    ☐ Child Protection Unit

_____

---

Referred by: _____   Transported by: _____

Purpose of Detention: ☐ Arrest Warrant   ☐ Criminal Offense   OTHER PURPOSE:
                      ☐ Bench Warrant    ☐ Probation Revocation
                      ☐ Adjudication     ☐ 24 Hour Detention   _____

CHARGE(S): _____

---

Juvenile lives with: ☐ Both Natural Parents   ☐ Mother Only         ☐ Father Only
                     ☐ Mother & Step Parent   ☐ Father & Step Parent ☐ Mother & Live In Partner
                     ☐ Adoptive Family        ☐ Foster Family        ☐ Other:

**PRESENTLY MINOR LIVING WITH:**                  **BIOLOGICAL PARENTS:**

Name: _____        Name: _____

Address: _____     Address: _____

Phone No.: _____   Phone No.: _____

Employer/Tel. No.:_____     Employer/Tel. No.: _____

---

Contact Person on Emergency: _____   Relationship: _____

Tel. No. _____   Parent(s)/Legal Guardian(s) Contacted By: _____

Date Contacted Parent(s)/Legal Guardian(s): _____ (M/D/Y)   Contacted By: _____

Name of Reporting Staff: _____   _____
                          Print Full Name              Staff's Position/Title

Staff Signature: _____   000041 Date: _____   Time: _____

**EXHIBIT G--MEDICAL CARE**

## KAGMAN JUVENILE DETENTION & CORRECTIONAL FACILITY
## HEALTH QUESTIONNAIRE

Name: _____  Age: _____  Date of Birth: _____

Family Doctor: _____  Dentist: _____

**FAMILY HISTORY** (Answer questions YES or NO unless otherwise indicated)

Does your mother, father, or brothers/sisters have any of the following health problems? <u>CIRCLE</u> if YES.

Asthma, Cancer, Diabetes, Heart Disease, Stroke, High Blood Pressure, Kidney Problems, Epilepsy

**HEALTH HISTORY** (Answer questions YES or NO unless otherwise indicated)

1. Are you usually healthy? _____ Yes _____ No        (Circle if you have a history of)

   Asthma, Earaches, Headaches, Anemia, Diabetes, High Blood Pressure, Heart Murmur, Bladder Infections, Ulcers, Head Injury, Rectal Bleeding, Hepatitis, Other: _____

2. Have you been sick or had any problems since you entered the Juvenile Facility?
   _____ Yes _____ No

3. Are you allergic to any medicine, foods, bee stings? _____ Yes _____ No
   List: _____

4. List any medicine you are taking now or in the last 6 months: _____

5. Have you seen a doctor, a dentist, or psychiatrist in the last 6 months? _____ Yes _____ No

6. Have you ever thought of or attempted to kill yourself? _____ Yes _____ No

7. Do you smoke? _____ Yes _____ No

8. Do you drink? _____ Yes _____ No

9. Do you use street drugs? _____ Yes _____ No

**SEXUAL HISTORY**

1. Are you sexually active? If YES, how many partners in the past year? _____

2. How old were you when you first had intercourse (sex)? _____

3. When was the last time you had intercourse (sex)? _____

**000042**

**EXHIBIT G--MEDICAL CARE**

KAGMAN JUVENILE DETENTION & CORRECTIONAL FACILITY

4. Have you ever been sexually or physically abused? _____

5. Do you or your partner use any form of birth control? _____ Yes _____ No
   CIRLCE what type of birth control you and your partner use:

   Oral contraceptives (pills)          Diaphragm
   Condoms                              Withdrawal
   Foam, suppositories                  Abstinence (not having sex)
   Sponge

6. Have you ever had:

| | | | | |
|---|---|---|---|---|
| Pelvic Infections | _____ | Yes | _____ | No |
| Herpes (sores) | _____ | Yes | _____ | No |
| Chlamydia Infection | _____ | Yes | _____ | No |
| Venereal warts | _____ | Yes | _____ | No |
| Gonorrhea | _____ | Yes | _____ | No |
| Syphilis | _____ | Yes | _____ | No |
| Pubic Lice | _____ | Yes | _____ | No |

**GIRLS ONLY**

When was your last period? _____

How often does your period come?  Monthly _____ Every 1-2 months _____
Other: _____

Are you now or are planning to become pregnant? _____ Yes _____ No

**EVERYONE**

Would you like information on any of the following subjects?  Please circle.

| | | |
|---|---|---|
| Sexually transmitted diseases | Yes | No |
| AIDS | Yes | No |
| AIDS Testing | Yes | No |
| How to stop smoking | Yes | No |
| Drug abuse and health hazards | Yes | No |
| Alcohol abuse | Yes | No |
| Birth control methods | Yes | No |
| Depression | Yes | No |
| Diet and Nutrition | Yes | No |
| Family problems | Yes | No |
| Emotional problems | Yes | No |
| Family Planning | Yes | No |

Page 1 of 2

**000043**                                    KJD&CF Health Questionnaire

# EXHIBIT G--MEDICAL CARE



## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

## DEPARTMENT OF CORRECTIONS
Vicente Taman Seman Building
P.O. Box 506506, Saipan, MP 96950
Telephone: (670) 664-9061 Facsimile: (670) 664-9515



| Part | Section | Title | Policy No. | Review Date |
|------|---------|-------|-----------|-------------|
| Institutional Services | Health Care | Universal Precautions Against Infectious Diseases | 4.5.25 | |
| **ACA Standard** | 3-ALDF-4E-35 Management of Serious and Infectious Diseases | | | |
| **Consent Decree** | Paragraph 51 Train staff in preventing spread of communicable diseases. | | | |

## I. PURPOSE

To establish procedures for correctional staff in reducing the risk of contracting communicable disease(s) during the performance of their official duties.

## II. POLICY

It is the policy of the Department of Corrections (DOC) to take all reasonable measures to allow its correctional staff to perform their duties in a safe and effective manner through universal precautions when dealing with individuals who are admitted into the DOC. In order to minimize potential exposure to communicable diseases, correctional staff must assume that all persons are potential carriers of a communicable disease. It shall also be the policy of the Department that every person receives appropriate service and emergency care regardless of their physical condition.

## III. DEFINITIONS

A. **Acquired Immunodeficiency Syndrome (AIDS)**

B. **Air-Borne:** Transmission of diseases infected air and/or water based droplets are passed into the air by coughing, sneezing or breathing.

C. **Blood:** Means human blood, human components and products made from human blood.

D. **Bloodborne Pathogens:** Means a bacterium or fungus that is present in human blood and can cause diseases in human such as hepatitis B virus (HBV) and human immune deficiency virus (HIV).

E. **Bodily Fluids:** Liquid secretions including, but not limited to blood, semen, vaginal or other secretions that might contain these fluids such as saliva, vomit, urine or feces.

1

F. **Communicable Disease:** Those infectious illnesses that are transmitted through direct or indirect (including airborne) contact with an infected individual, including but not limited to the body fluids of the infected individual.

G. **Contaminated:** Means the presence or the reasonably anticipated presence of blood or other potentially infectious materials on an item or surface.

H. **Contaminated Sharps:** Means any contaminated objects that can penetrate the skin including, but not limited to needles, scalpels and broken glass.

I. **Occupational Exposure Incident:** Means a specific eye, mouth and other mucous membrane contact with blood or other potentially infectious material that results from the performance of an employee's duties.

J. **Hepatitis A:** Is an acute viral hepatitis that is transmitted primarily by the fecal-oral route.

K. **Hepatitis B:** Is an acute or chronic viral hepatitis that is transmitted through blood exposure and sexual contact.

L. **Hepatitis C:** Is an acute or chronic viral hepatitis that is transmitted primarily by blood exposure.

M. **Human Immunodeficiency Virus (HIV):** Is the virus that causes AIDS.

N. **Personal Protective Equipment:** Specialized clothing or equipment worn or used by correctional staff for protection against the hazards of infection.

O. **Tuberculosis (TB)** is a disease that can damage a person's lungs or other parts of the body and can cause serious illness.

P. **Universal Precautions:** Procedures that emphasize precautions based on the assumption that all blood and bodily fluids are potentially infectious of the AIDS (HIV), hepatitis B (HBV) and other viruses.

## IV. THE DISEASES

### A. Hepatitis A Virus (HAV)

Signs and Symptoms

- Adults will have signs and symptoms more often than children.
- Jaundice – yellowing of the skin or eyes
- Fatigue
- Abdominal pain
- Loss of appetite
- Nausea
- Diarrhea
- Fever

2

# EXHIBIT G--MEDICAL CARE

## Long Term Effects

- There is no long-term infection.
- Once you have had HAV you cannot get it again.

## Transmission

- HAV is found in the feces of persons with hepatitis A.
- HAV is usually spread from person to person by putting something in the mouth (even though it may look clean) that has been contaminated with the feces of a person with hepatitis A.

## Persons at Risk of Infection

- Contacts with infected persons.
- Sex contacts of infected persons.
- Men who have sex with men.
- Injecting and non-injecting drug users.

## Prevention

- Hepatitis A vaccine.

## B. Hepatitis B Virus (HBV)

### Signs and Symptoms

- About 30 % of persons have no signs or symptoms.  Signs and symptoms are less common in children than adults.
- Jaundice -- yellowing of the skin or eyes
- Fatigue
- Abdominal pain
- Loss of appetite
- Nausea, vomiting
- Joint pain

### Long Term Effects Without Vaccination

- Chronic (long term) infection occurs in 6 % of persons infected after age 5 years.
- Death from chronic liver disease occurs in 15-25 % of chronically infected persons.

### Transmission

- HBV is spread through having sex with an infected person without using a condom.
- Sharing needles when using drugs.
- Through needle sticks or sharps exposures on the job.

3

**EXHIBIT G--MEDICAL CARE**

- Getting a tattoo or body piercing.

## Risk Groups

- Persons with multiple sex partners or diagnosis of a sexually transmitted disease.
- Men who have sex with men.
- Contacts of infected persons.
- Injection drug users.
- Hemodialysis patients.

## Prevention

- Hepatitis B vaccine.

## C. Hepatitis C Virus (HCV)

### Signs and Symptoms

- 80 % of persons have no signs or symptoms.
- Jaundice – yellowing of the skin or eyes
- Fatigue
- Dark urine
- Abdominal pain
- Loss of appetite
- Nausea

### Transmission

- Occurs when blood or body fluids from an infected person enters the body of a person who is not infected.
- HCV is spread through sharing needles when shooting drugs.
- Through needle sticks or sharps exposures on the job.
- Getting a tattoo or body piercing.

### Long Term Effects

- Chronic infection: 75-85 % of infected persons.
- Chronic liver disease: 70 % of chronically infected persons.
- Deaths from chronic liver disease: less than 3 %.
- Leading indication for liver transplant.

### Prevention

- No vaccine to prevent hepatitis C.
- Correctional staff should always follow universal precautions.

## D. Human Immunodeficiency Virus (HIV) is the virus that causes AIDS.

4

# EXHIBIT G--MEDICAL CARE

Transmission

- Blood
- Semen
- Vaginal fluid
- Breast milk
- Other body fluid containing blood.
- Sexual contact with an infected person.
- Workers have been infected with HIV after being stuck with needles containing HIV-infected blood, or from worker's open cut or mucous membrane (example, the eyes or inside of the nose).

Long Term Effects

- Infection with HIV can weaken the immune system to the point that it has difficulty fighting off certain infections.

Prevention

- No vaccine for HIV.
- Medical treatment can slow down the rate at which HIV weakens the immune system.
- There are treatments that can prevent or cure some of the illnesses associated with AIDS.
- Correctional staff should always follow universal precautions.

## E. Tuberculosis (TB)

Signs and Symptoms

- A cough that last longer than two (2) weeks
- Fevers
- Constant tiredness
- Weight loss
- Night sweats
- Loss of appetite
- Coughing up blood (occasionally)
- Pain in the chest
- Weakness or fatigue

People with active TB disease may have only mild symptoms. They may be spreading their germs to others without even knowing that they have TB. Usually have a positive skin test.

A person can be infected for years with inactive TB without any signs of TB disease.

Transmission

5

000048

# EXHIBIT G--MEDICAL CARE

- TB is spread through the air from one person to another.
- The bacteria are put into the air when a person with TB disease of the lungs or throat coughs or sneezes.
- People nearby may breathe in these bacteria and become infected.
- When a person breathes in TB bacteria, the bacteria can settle in the lungs and begin to grow. From there, they can move through the blood to other parts of the body, such as the kidney, spine, and brain.

### Prevention

- TB disease can almost always be cured with medicine. But the medicine must be taken as the doctor or nurse tells you.
- If you have TB of the lungs or throat, you are probably infectious. You need to stay home from work so that you don't spread TB bacteria to other people. Your doctor or nurse will tell you when you can return to work.
- Always cover your mouth with a tissue when you cough, sneeze, or laugh. Put the tissue in a closed paper sack and throw it away.
- Avoid close contact with anyone
- You must continue to take the medicine even if you start feeling well after a few weeks of treatment.
- If you don't continue taking your medicine or you aren't taking your medicine regularly, the bacteria will grow again and you will remain sick for a longer time. The bacteria may also become resistant to the drugs you are taking.
- People who may have spent time with you may need to be tested for latent TB infection.

### Long Term Effect

- The bacteria can attack any part of the body, but they usually attack the lungs, which can cause death.

## V.  PROCEDURAL GUIDELINES

Due to the diverse types of people that correctional staff deals with on a regular basis, the potential of encountering a person with communicable disease is high. In addition, correctional staff may encounter individuals who are injured and/or with a communicable disease which may cause exposure to infectious diseases. It is for these reasons that correctional staff must learn to protect themselves from communicable diseases that may be present in the work place. Recognition and determination of different body fluids is difficult or impossible, therefore, universal precautions shall be observed to prevent contact with blood, body fluids, or other potentially infectious materials. All body fluids shall be considered potentially infectious materials. Exposure to blood or body fluids does not mean that you will be infected. But because you do not know if someone else is infected, you must avoid contact with blood and bodily fluids of all inmates and fellow employees. Inmates and/or arrestees who are coughing, sneezing or intentionally biting or spitting should be considered infectious. It shall be the responsibility of each employee to use protective barriers when exposure to blood and/or body fluids are anticipated or known. It shall be the responsibility of each supervisor to instruct and direct employees, as

# EXHIBIT G--MEDICAL CARE

appropriate if proper protective precautions are not being taken. The staff of the DOC will seek assistance and guidance from the Commonwealth Health Center (CHC) when questions arise regarding universal precautions and communicable diseases.

## Personal Protective Equipment

When it is believed that exposure incident may occur, correctional staff will use appropriate personal protective equipment to prevent blood or other potentially infectious materials from reaching the employee's work clothes, street clothes, undergarments, skin, eyes, mouth, or other mucous membranes under normal conditions of use and for the duration of time which the protective equipment will be used. The shift supervisor will ensure that appropriate personal protective equipment is available and accessible to the employees during the shift.

The shift supervisor will ensure that subordinates uses appropriate personal protective equipment unless the shift supervisor and/or the subordinate in their best judgments the use of such equipment will prevent the delivery of health care, safety and/or posed an increased hazard to the safety of the officer and/or inmate. In such instances, the shift supervisor will submit a report to the Operations Captain detailing the circumstances. The Operations Captain will make an evaluation of the event and make recommendations to the Director of Corrections to prevent similar occurrences in the future.

When appropriate personal protective equipment is available, correctional officers will not refuse to admit process or physically handle any person who may be a carrier of a communicable disease.

The shift supervisor is responsible for continuously maintaining an adequate supply of disease control supplies in a convenient location for his/her personnel. Replacement of disease control supplies shall be channeled to the Logistic/Supply Section.

## Gloves

Disposable (single use) gloves such as surgical or examination gloves shall be worn when it can be reasonably anticipated that the officer may have hand contact with the following:

- Blood
- Other potentially infectious materials
- Mucous membranes
- Non-intact skin
- Handling or touching contaminated items or surfaces

Disposable gloves shall not be washed or decontaminated for re-use. Disposable gloves must be discarded if they are cracked, peeling, torn, punctured, or exhibit other signs of deterioration or when their ability to function as a barrier is compromised.

When using disposable gloves, the following shall be kept in mind:

- Cover any hand cuts and remove jewelry.
- Tell the shift supervisor if you get a rash or red, and/or irritated hands.

# EXHIBIT G--MEDICAL CARE

- Don't touch the outside when removing gloves.
- Dispose of gloves properly.
- Wash your hands immediately after removing your gloves.

## Masks, Eye Protection, and Face Shields

Masks in combination with eye protection devices, such as goggles or glasses with solid side shields or chin-length face shields, shall be worn whenever splashes, spray, spatter or droplets of potentially infectious materials may be generated and eye, nose or mouth contamination can be reasonably anticipated.

When using a mask, the following shall be kept in mind:

- The mask must be checked before use for breaks or rips.
- The mask must be washed and disinfected before and after each use.
- Mask that is defective must be repaired or replaced.

## Gowns, Aprons, and Other Protective Body Clothing

Gowns, aprons, lab coats, or other outer garments shall be worn as determined by the degree of exposure anticipated.

## Mouthpiece

Plastic mouthpiece, pocket mask, or other authorized barrier/resuscitation devices shall be used whenever an officer performs CPR or mouth-to-mouth resuscitation. When plastic mouthpiece or pocket mask is used, the officer will ensure that it is properly cleaned and/or disinfected. Defective plastic mouthpiece or pocket mask will be replaced.

## Hand Washing

According to the Center for Disease Control and Prevention (CDC), hand washing is one of the most important means of preventing the spread of infection.

Correctional officers are encouraged to observe the following with respect to hand washing:

- Beginning and end of the workday.
- Before and after using gloves.
- Before eating, handling food or medication.
- After using the toilet.
- After touching your nose or face.
- After touching contaminated surfaces or equipment.
- When going to another area or section.

When washing your hands:

- Turn on faucet.
- Wet hands.

# EXHIBIT G--MEDICAL CARE

- Use soap or other hand washing detergent.
- Wash for 10 seconds, use friction.
- Rinse off soap.
- Dry with paper towel.
- Turn off water with the used paper towel to prevent contaminating your hands on the faucet.

## General Housekeeping

The shift supervisor shall ensure that the worksite and housing units are maintained in a clean and sanitary condition and shall conduct periodic inspection to ensure that cleanliness is maintained.

The daily shift supervisor shall determine and implement written schedules as appropriate for cleaning and decontamination based on the location within the facility or work environment, the type of surface or equipment to be cleaned, the type of soil present and the tasks and procedures to be performed in the area.

All equipment and environmental and work surfaces must be cleaned and decontaminated after contact with blood and other potentially infectious materials as provide in this policy.

All bins, pails, cans and similar receptacles intended for re-use which have a reasonable likelihood for becoming contaminated with blood or other potentially infectious materials shall be inspected and decontaminated on a regularly scheduled basis and cleaned decontaminated immediately or as soon as feasible upon visible contamination.

Broken and potentially contaminated glassware, needles or other sharp instruments shall not be picked up directly with the hands. It shall be cleaned up using mechanical means such as brush and dustpan. Contaminated glassware, needles or other sharp instruments shall not be stored in a manner that requires that they be retrieved manually. Contaminated materials shall be discarded immediately or as soon as feasible in containers that are closable, puncture resistant, leak proof on sides and bottom and properly labeled. In disposing contaminated materials, established federal and local regulations shall be followed.

Contaminated laundry and personal protective equipment shall be bagged or containerized at the location where it was used in an approved leak proof containers but should not be sorted, rinsed or cleaned at that location. Employee shall wear protective gloves and other appropriate personal protective equipment when handling contaminated materials.

Officers shall not smoke, eat, drink, chew betelnut, or apply makeup around bodily fluid spills or when wearing protective gloves.

## Custody, Search and Transporting of Prisoners

### Custody

When appropriate protective equipment is available, correctional officer shall not refuse to interview, assist, or otherwise physically handle any person who may have a communicable

9

**000052**

# EXHIBIT G--MEDICAL CARE

disease. Should an officer be involved in an incident where proper safety materials are not available, the officer shall immediately contact the shift supervisor and request assistance.

When possible, individuals taken into custody with bodily fluids on their body or clothing, and not in need of medical attention shall be isolated from other persons until clean up has been completed and a change of clothes has been provided. Officers shall document that an individual was taken into custody that has bodily fluids on their person. The individual shall be asked if he/she has communicable disease and the response shall be documented.

Officers shall not put their fingers in or near the mouth of any conscious person. Officers utilizing protective gloves can, in life threatening situations insert their finger into the mouth of an unconscious person to attempt to clear a blocked airway in accordance to CPR procedures. In administering CPR, officers shall use pocket mask, plastic mouthpiece or other approved devices to prevent the person's saliva or vomits from entering the caregiver's mouth.

All officers dealing with persons who have blood or other body fluids on their body or clothing will be personally responsible for following universal precautions and using the personal protective equipment provided.

## Search

An officer should use great caution in searching the clothing, cell and the person of inmates. The following should be observed when searching inmate's clothing and person:

- Ask inmate to empty his/her pockets.
- Wear protective gloves if exposure to blood is likely to be encountered.
- Wear protective gloves for all body searches.
- If searching a purse, carefully empty contents directly from the purse by turning it upside down over a table.
- Use puncture-proof containers to store sharp instruments and clearly marked plastic bags to store other possibly contaminated items.
- Always use flashlight to search hidden areas.

## Transfer/Transporting

During a transfer of custody, officers have an obligation and shall discreetly notify support personnel that the individual has bodily fluid on their person or that the individual has said that he/she has a communicable disease. Care must be taken to insure that the information is given only to those who have a need to know.

Individuals with bodily fluids on their persons shall be transported in separate vehicles from other persons.

## Disinfections

Any unprotected skin surfaces that come into contact with bodily fluids shall be thoroughly washed as soon as possible with hot running water and soap for at least 15 seconds before rinsing and drying.

10

Alcohol or antiseptic towelettes may be used where soap and water are unavailable.

Disposable gloves should be rinsed before removal and hands and forearms should then be washed.

Skin surfaces shall be washed and mucous membranes flushed as soon as feasible following the removal of any personal protective equipment.

All open cuts and abrasions shall be covered with waterproof bandages before reporting to duty.

The following disinfections procedures shall be initiated whenever bodily fluids are spilled or an individual with bodily fluids on his person is transported in a departmental vehicle:

- Affected vehicle shall be immediately designated with the posting of an "Infectious Disease Contamination" sign while awaiting disinfection.
- Personnel shall remove any excess bodily fluids from the vehicle with an absorbent cloth, paying special attention to any cracks, crevices or seams that may be holding fluids.
- The affected areas should be disinfected using hot water and detergent or alcohol and allowed to air dry.
- All vehicles scheduled for washing and routine maintenance shall, as part of that routine, be cleaned in the interior with an approved disinfectant.

**Occupational Exposure**

All correctional staff that has been determined to be at risk for occupational exposure to the hepatitis B virus shall be provided with the opportunity to take the HBV vaccination series at no cost. The vaccination will be coordinated with CHC personnel. Correctional staff that declines to take the HBV vaccination series will be recorded by CHC personnel. The employee who initially declines to take the HBV vaccination series but at a later date decides to accept the vaccination, the employee must be provided with the vaccination.

Any person who has unprotected physical contact with blood or other bodily fluids of another person while in the line of duty shall be considered to have been potentially exposed to HBV and/or HIV. The shift supervisor will submit a report to the Operations Captain detailing the means and circumstances under which the exposure occurred. The Operations Captain will inform the Director of Corrections of all occupational exposure incidents as soon as possible.

Immediately after exposure, the officer shall proceed to the CHC for tests of evidence of infection and treatment of any injuries. CHC will continue testing the officer for evidence of infection and provide psychological counseling as determined by CHC health official.

The officer shall receive a copy of the health care provider's written opinion within 15 days of the evaluation and information on any conditions resulting from the exposure that require further evaluation or treatment.

# EXHIBIT G--MEDICAL CARE

Unless disclosure to an appropriate department official is authorized by the officer or by CNMI law, the officer's medical evaluation, test results and any follow-up procedures shall remain confidential. Before any confidential information is to be released, the Director of Corrections must be informed and must approve the release of the confidential information. Any employee who divulges confidential or medical information in regard to a victim or suspected victim of a communicable disease will result in disciplinary action.

Any person responsible for potentially exposing a correctional staff and/or inmate to a communicable disease shall be encouraged to undergo testing to determine if the person has a communicable disease. The person shall be provided with a copy of the test results and a copy shall be provided to the DOC and the exposed person. The exposed person shall be informed of applicable regulations concerning the disclosure of the identity and infectious status of the source individual. Criminal charges may be sought against any person who intentionally exposes a correctional officer and/or inmate to a communicable disease.

An officer who tests positive for HIV or HBV may continue working with the DOC provided the medical opinions and advice of CHC official's states that the affected officer does not pose a safety and health threat to himself/herself, the public, staff or inmates.

All correctional staff shall treat employees and/or inmates who have contracted a communicable disease fairly, courteously and with dignity.

## Record Keeping

The DOC shall maintain an accurate record of each employee and/or inmate with occupational exposure that includes information on vaccination status, results of all examinations, tests and follow-up procedures, health care professional written opinion and any other information related to the occupational exposure. The health records shall be placed in a secured area with limited access and may not be disclosed or reported without the express written consent of the employee or inmate and the approval by the Director of Corrections.

## Training

The Training Coordinator of the DOC will ensure that all correctional staff with occupational exposure is provided with a complete copy of this policy and procedures and an in-service training are provided with respect to this policy.

All affected employees shall receive annual refresher training and additional training whenever job tasks or procedures are modified in a manner that may alter their risk of exposure.

All trainees shall have access to applicable federal and CNMI regulations pertaining to the regulation of bloodborne pathogens. Federal regulations 29 CFR part 1910.1030 and National Institute for Occupational Safety and Health (NIOSH), NIOSH Publication #89-108, A Curriculum Guide for Public Safety and Emergency Response Workers as well as additional information with respect to communicable diseases and other diseases that may be contracted in a prison setting may be obtained through the Training Coordinator's office and/or CHC.

**EXHIBIT G--MEDICAL CARE**

The Training Coordinator shall maintain complete records on correctional staff training to include dates and content of training sessions, names and qualifications of persons conducting the training and the names and job titles of all persons attending the training sessions.

Approved By: _____          6/26/09
                Dolores M. San Nicolas                    ‾‾‾‾‾‾‾‾‾‾‾
                Commissioner of Corrections                   Date

13
000056

# EXHIBIT G--MEDICAL CARE
## CNMI DOC ACADEMY CLASS ROSTER

**Course/Subject:** Universal Precautions Against Infectious **Date:** Sep. 30, 2013
Diseases / Pharmaceutical

RECEIVED
Office of the Attorney General
Civil Division
Date: 10/1/13
Time:

| Name: | Signature: | |
|---|---|---|
| Ajoste, Basilio Bryan P. | | |
| Aldan, Nina Demapan | | |
| Ambalan, Nardson T. | | |
| Angui, Harvin D. | | |
| Ascano, Ralph Josalie K. | | |
| Bahillo, Jason Aranda | | |
| Bhuiyan, Tawhid Kaptleo | | |
| Camacho, Edwin B. | | |
| Cangco, Svali Peter D. | | |
| Chen, Derick | | |
| Davis, Jackson Kaipat | | |
| Dela Cruz, Eloy Franklin Jr. R. | | |
| Deleon Guerrero, Cris R. | | |
| Flores, Audrea | | |
| Fumkugub, Jessie Ann S. | | |
| Galarse, Leo C. | | |
| Herman, Romeo Jr. S. | | |
| Ichihara, Paul Jr. Cepeda | | |
| Iglecias, Travis Dela Cruz | | |
| Ilek, Domingo M. | | |
| Kaipat, Vincent | | |
| Laniyo, Bert Limes | | |
| Maratita, Jake Hiram U. | | |
| Masga, Shawn Sablan | | |
| Matsutaro, Sansamic J. | | |
| Ngeskebei, Marvin M. | | |
| Ogumoro, Trevor John | | |
| Reyes Abraham T. | | |
| Reyes, Luizi Angui | | |
| Sablan, Mart Camacho | | |
| Sakisat, Duwayne A. | | |
| Salas, Michael M. | | |
| Sanchez, John Jr. K. | | |
| Sanchez, Monette C. | | |
| Santor, Sheelanc S. | | |
| Somorang, Peter N. | | |
| Taisakan, Koji | | |
| Taitano, Vincent M. | | |
| Yamada, Bo Naputi | | |

**Instructor:** Ramas, RN

**Date:** 09/30/13

**EXHIBIT G--MEDICAL CARE**




*COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS*

## DEPARTMENT OF CORRECTIONS

Vicente Taman Seman Building
P.O. Box 506506, Saipan, MP 96950
Telephone: (670) 664-9061, Facsimile: (670) 664-9515

| Part | Section | Subject | Policy No. | Review Date |
|---|---|---|---|---|
| Institutional Services | Health Care | Pharmaceutical | 4.5.10 | |
| **ACA Standard** | 3-ALDF-4E-17 Dispensing of Medications, Accountability and Storage | | | |
| **Consent Decree** | Paragraph 54 Develop Facility Policies and Procedures | | | |

## I.   PURPOSE

To establish procedures that ensures accountability in the administration of medications to inmates/detainees.

## II.   POLICY

It is the policy of the Department of Corrections (DOC) to ensure safe and secure use of pharmaceutical products prescribed to inmates/detainees.

## III.   PROCEDURE

### A. Pharmaceuticals

1. All drugs will be stored under proper conditions of sanitation, temperature, light, moisture, ventilation, segregation, and security.

2. Antiseptics, other drugs for external use and disinfectants are stored separately from internal and injectable medications. Drugs requiring special storage for stability are so stored.

3. The facility nurse and the Operations Captain will be responsible for the security and control of all pharmaceutical products.

4. The pharmacist consultant from the Commonwealth Health Center (CHC) will do on-site quarterly review of records, procedures, storage of pharmaceuticals, administration of medications, drug recall and conduct biannual inventory of all controlled drugs.

5. An adequate and proper supply of antidotes and other emergency medications, and related information (including posting of the poison control telephone number in areas where overdoses or toxicologic emergencies are likely) in accordance to applicable standards.

# EXHIBIT G--MEDICAL CARE

6. The facility nurse will develop a formulary (drug list) for pharmaceuticals stocked by him/her in the facility pharmacy.

7. All prescription medications will be obtained in the following manner:

   a. A qualified health care professional licensed to do so will write the prescription.

   b. This prescription is given to the nurse.

   c. The nurse then gives the prescription to the Operations Captain who will assign a roving officer to take it to the Inpatient Pharmacy at CHC to be filled.

   d. The officer will accept the medication from pharmacy personnel and sign receipt of the medication.

   e. The officer will deliver the medication to the nurse.

   f. The facility nurse then secures the medication in the facility pharmacy and notes the medication information on the medication Log-out Sheet, to be followed by officers during his/her absence. See attachment A.

   g. If the nurse is not on duty, the roving officer takes the medication to the Housing Sergeant to be stored in the facility pharmacy. The Housing Sergeant then notes the prescription information on the medication administration sheet.

8. If medications are brought in with the arrestee-*after processing has been completed*; the Intake and Booking Sergeant will notify the nurse that there are medications from home. The nurse will retrieve those medications, take them to the Medical Station and inventory them. The nurse will then contact the:

   a. Prescribing physician to verify order.

   b. Medical Director for updated orders. The Medical Director will then submit updated prescriptions to the CHC in-patient pharmacy to be filled. (Who is the Medical Director?)

   c. Either a correctional officer or the nurse will bring the medication to DOC and the facility nurse will place them in the facility pharmacy.

   d. The nurse will **_never_** be involved in the booking procedures involving medications, as the arrestee is not legally confined until the booking procedures are completed.

## EXHIBIT G--MEDICAL CARE

9. Medication will be administered in the following manner:

    a. Daily when the nurse is on duty, he/she will go to each living unit and administer medications at the appropriate time as noted on the medication administration sheet and document it.

    b. When the facility nurse is not on duty, the housing sergeant will be responsible to get the prepared medication by the nurse and deliver them to each housing unit for the housing officer to administer. The officer's name will be documented in the housing unit logbook in order to assure accountability. The officer will note on the Medication Administration Sheet form the inmates/detainees that are to receive medication and at the specified times. The officer will be responsible for administering medications at the correct times and documenting them appropriately in the MAS (attachment B).

    c. When medication is administered, the person administering the medication will verify the inmate's/detainee's name against the medication container. The administering person will then verify with MAS information against information on the medication label. The five (5) 'R's will be considered and verified.

        1. Right Person
        2. Right Medication
        3. Right Time
        4. Right Dose
        5. Right Route (oral, inhaled, and topical)

    d. When medication is administered, it is the responsibility of the administering person to observe the medication being swallowed. The oral cavity is then inspected and both hands, to ascertain that the medication was not 'palmed'. This procedure is referred to as DOT-directly observed therapy.

    e. If a medication is prescribed 'as ordered'; it becomes the responsibility of the inmate/detainee to request the medication according to the need decided on by the prescribing physician and the inmate/detainee. The officer designated as responsible for dispensing medications on that shift for the housing unit should then supply the inmate/detainee with the medication within 10 minutes of the request.

    f. If the inmate/detainee refuses his/her medication, the officer administering the medication will note in the housing unit logbook that the inmate/detainee refused the medication. This information will then be forwarded to the nurse if on duty or the Housing Sergeant to be noted in the MAS for documentation.

10. Maintenance of records will occur in the following manner:

    a. Monthly, on the last working day of the month, the nurse will go to each housing unit, review all Medication Administration Sheet (MAS)-removing expired ones and replacing with the new months MAS. At that time, the nurse will note what medications need to be refilled.

11. Adequate control and accountability of medication will occur in the following manner.

    a. Any medications no longer ordered or outdated in dose packs will be returned to CHC in-patient pharmacy for disposition.

    b. Medications in bulk containers that have expired prescriptions will be brought to CHC by the nurse for disposal.

    c. All expired MAS's will be collected monthly by the nurse and placed in the inmates'/detainee's medical file. At that time, the nurse will review the MAS's for doses missed and incorrect documentation. If trends are noted, the nurse will notify the Operations Captain, so that issues are addressed in a timely manner. Feed back of actions taken will be given to the nurse so that she may report this information to the consulting pharmacist.

    d. No correctional officer can discontinue prescribed medication.

    e. Psychotropic or behavior-modifying medication will be prescribed only when clinically indicated (as one facet of a program of therapy) and not for disciplinary reasons.

    f. Medications will be maintained under the control of the nurse except for 'Keep on Person', must be approved by the Director. Inmates/detainees do not prepare, dispense or administer medication.

    g. The facility pharmacy will be devoid of drugs that are outdated, discontinued, or recalled. No other items will be kept in the pharmacy without the authorization of the Commissioner or Director.

    h. All medications brought to the facility by inmates/detainees will be noted in the appropriate section of the Intake Health Screening form. The medications will be given to the nurse for safekeeping and the dispensing of the medication will be in accordance to the above procedures. The officer who receives the inmate/detainee on the housing unit will note in the housing unit log book- the name of the medication, the amount of the medication and the name of the person for whom it was prescribed. The Commander will then notify the nurse of the presence of the medication. When an inmate is released his medication will be released with him. The officer who releases the

inmate/detainee will note in the housing unit log book the name of the medication and the amount in the container.

i. If an inmate is transferred to another living unit, the nurse on duty will be notified by the Housing Sergeant. The nurse will take that inmate's medication and MAS to the receiving living unit and secure the medication in the medication storage age. The MAS will be placed in the appropriate section of the Medication log, located in the medication storage area.

j. DEA controlled substances will be stored in the pharmacy (Medical Station) in the locked cabinet. Only authorized Health Services staff will access to this cabinet. There will be a drug inventory form- Narcotics Documentation Roster sheet in the cabinet. This form will be a perpetual inventory. Any time a controlled substance is removed for administration a count will be done to verify the remaining quantity.

When controlled substances enter the facility, the receiving nurse will enter them in the Narcotic Documentation Roster and secure the medication in the facility pharmacy in the Medical station. When the nurse's shift is over she will turn over the controlled medication for the inmate/detainee to the Housing Sergeant. The Housing Sergeant and the nurse will count the amount of medication and document this information on the Roster sheet. When there is a shift change the out-going Housing Sergeant and the in-coming Housing Sergeant will count the controlled medication and the information along with the time, date and both officers signatures will be entered on the Roster sheet. The sheet and the medication will be kept in the facility pharmacy. It will never be left anywhere other than the pharmacy. The Housing Sergeant will administer the controlled medication as ordered by the prescribing physician. No other officer may administer the controlled medication.

If at any time, controlled medication is unaccounted for, the Housing Sergeant will notify the nurse. The nurse will notify the following:

1. Captain of Operations
2. Deputy Director
3. Director
4. Commissioner

The nurse will write an incident report and deliver it to the Operations Captain, who will then initiate an investigation into the unaccounted medications. A report of that investigation and its conclusion will be given to the Commissioner, Director and the Deputy Director. A copy of that report will be given to the nurse and he/she will submit a copy of that report to the Medical Director and the consulting pharmacist.

# EXHIBIT G--MEDICAL CARE

k. Medications will be stored at room temperature, unless otherwise specified. Medication requiring refrigeration will be stored in the Medical Station refrigerator, dedicated for that purpose. The temperature is maintained at 35 to 45 degrees Fahrenheit. This temperature will be checked daily and documented in the Medical Station logbook.

l. Labels for all individual medications will include the following information:

1. Name of supplying pharmacy
2. Rx Number
3. Drug name
4. Instructions for administering
5. Amount of medication dispensed
6. Date prescribed
7. Date expired
8. Inmates name
9. Physician Name
10. Refill information

Reviewed By: _____ 12/17/17
        Gregory F. Castro            Date
        Director of Corrections

Approved By: _____ 12/17/07
        Lino S. Tenorio            Date
        Commissioner of Corrections

000063

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Case 1:99-cv-00017 Document 65-1 Filed 04/30/14 Page 65 of 73

EXHIBIT G--MEDICAL CARE

Inmate's Name: ████████████

Hospital number

Date of birth

Remaining refills _____

Allergies: _____

| Medication/dosage | Time | Date Started: | | | | | | | | JANUARY 2013 | | | | | | | | | | Date Completed: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SEPTEMBER | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TAKE 1 TAB BY MOUTH AT BEDTIME | 2000 | 𝒙 | 𝒙 | | | 𝒙 | | 𝒙 𝒙 | | | 𝒙 | | 𝒙 | 𝒙 | 𝒙 𝒙 | NT | 𝒙 | 𝒙 | 𝒙 𝒙 | | | | 𝒆 | NT | | | | | 𝒙 | 𝒙 | 𝒙 | |

000064

| Name: | | Name: | Initial | Name | Initial | Name | Initial |
|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | D. Kawshi | RCK | R. TEDELENO | NT | | |
| Lizama | 𝒙 | A. Colgun | 𝒆 | CO2 S. Norita | 𝒆 | | |
| | | M. Cruz | The | CO2 R. Sasan | | | |
| | | CO2 S. Norita | 𝒆 | | | | |
| | | A. Laving | 𝒙 | | | | |
| | | R. Sapita | 𝒙 | | | | |

| R-Refused |
|---|
| O-S Out of Stock |
| I-C Incomplete |
| C-Complete |

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Case 1:99-cv-00017 Document 65-1 Filed 04/30/14 Page 66 of 73

EXHIBIT G--MEDICAL CARE

000065

Inmate's Name: ▮▮▮▮▮▮▮

Hospital number ▮▮▮▮▮

Date of birth

Remaining refills _____

Allergies: _____

| Medication/dosage | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DATE STARTED:** JANUARY 2013 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ▮▮▮▮▮▮ ▮▮▮ | 800 | EC | EC | H | EC | H | | RE | EC | EC | EC | EC | EC | EC | EC | EC | EC | J | F | F | F | EC | EC | EC | EC | F | F | F | EC | EC | EC | EC |
| ▮▮▮▮ ▮▮▮ | 800 | EC | EC | H | EC | H | | | EC | EC | EC | EC | EC | EC | EC | EC | EC | J | F | F | F | EC | EC | EC | EC | F | F | F | EC | EC | EC | EC |

**DATE COMPLETED:**

| Name: | | Name: | Initial | Name | Initial | Name | Initial | |
|---|---|---|---|---|---|---|---|---|
| Elaine Camacho,RN | | Ismael F. Palma sr | (initial) | Renato Espinola | (initial) | | | **R-Refused** |
| Rocel Cariaso,RN | | | | | | | | O-S Out of Stock |
| | | | | | | | | I-C Incomplete |
| | | | | | | | | C-Complete |

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Inmate's Name: ▓▓▓▓▓▓▓▓▓▓     Remaining refills _____     Allergies: _____

Hospital number ▓▓▓▓▓▓ _____     _____

Date of birth

EXHIBIT G--MEDICAL CARE

000066

| Medication/dosage | Time | Date started: | | | | | | | | | | | | | | | Date Completed: | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| ▓▓▓▓▓▓ | 0800 | — | | | | | — | | | — | | | | | — | | | | | ▷ | / | > | ec | ec | ec | ec | / | > | > | ec | ec | ec | c |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Name: | | Name: | | Initial | Name | | Initial | Name | | Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| Elaine Camacho,RN | | | | | | | | | | |
| Renato Espanola | ⌐ | | | | | | | | | |

R-Refused

O-S Out of Stock

I-C Incomplete

C-Complete

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Inmate's Name: ███████    Remaining refills _____    Allergies: _____

Hospital number _____

Date of birth ████

Case 1:99-cv-00017   Document 65-1   Filed 04/30/14   Page 68 of 73

EXHIBIT G--MEDICAL CARE

000067

| Medication/dosage | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ████ | 800 | | | | EC | EC | EC | | | | | | | | | | | | EC | EC | | EC | EC | | | EC | EC | EC | EC | EC | | |
| ████ | 800 | | | | EC | EC | EC | | | | | | | | | | | | EC | EC | | EC | EC | | | EC | EC | EC | EC | EC | | |
| ████ | 800 | | | | EC | EC | EC | | | | | | | | | | | | EC | EC | | EC | EC | | | EC | EC | EC | EC | EC | | |
| ████ | 800 | | | | EC | EC | EC | | | | | | | | | | | | EC | EC | | EC | EC | | | EC | EC | EC | EC | | | |
| ████ | 630 | | | | BP | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 1130 | | | | EC | EC | EC | | | | | | | | | | | | EC | EC | | EC | EC | | | EC | EC | EC | EC | | | |
| | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ████ | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Date started:    MARCH 2013    Date Completed:

| Name: | | Name: | Initial | Name | Initial | Name | Initial |
|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | COI. M. Cruz | MC | COI. Cruz RN | | | |
| Renato Espanola RN | | COI. A. Lomiyo Sr. | ML | COI. C. Cedrum | | | |
| | | CO2. B. Peter | BP | | | | |

R-Refused

O-S Out of Stock

I-C Incomplete

C-Complete

Inmate's Name: ▓▓▓▓▓▓▓▓    Remaining refills _____    Allergies: _____

Hospital number ▓▓▓▓▓▓▓▓ _____

Date of birth

EXHIBIT G-MEDICAL CARE

000068

| Medication/dosage | Time | Date started: March 2, 2013 | | | | | | | | | | | | | | | | | | | | | | | | | | | Date Completed: | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| ▓▓▓▓ | 0800 | ⌐ | ⌐ | ec | ec | ec | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | H | ⌐ | ec | ec | ⌐ | ec | ec | ⌐ | ⌐ | ec | ec | ec | ec | | ⌐ | ⌐ | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Name: | | Name: | Initial | Name | Initial | Name | Initial | | |
|---|---|---|---|---|---|---|---|---|---|
| Elaine Camacho,RN | | | | Roxel R. Camacho | ᴧ, | | | R-Refused | |
| Renato Española RN | ⌐ | | | | | | | O-S Out of Stock | |
| | | | | | | | | I-C Incomplete | |
| | | | | | | | | C-Complete | |

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Case 1:99-cv-00017 Document 65-1 Filed 04/30/14 Page 70 of 73
EXHIBIT G--MEDICAL CARE
000069

**Inmate's Name:** ███     **Remaining refills** _____     **Allergies:** _____

**Hospital number** ███

**Date of birth**

**Date Started:**     **MARCH 2013**     **Date Completed:**

| Medication/dosage | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| ███ | 800 | ⌐ | ⌐ | ⌐ | EC | EC | EC | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | H | ⌐ | EC | EC | ⌐ | EC | EC | ⌐ | ⌐ | EC | EC | EC | EC | EC | ⌐ | ⌐ |  |
| ███ | 800 | ⌐ | ⌐ | ⌐ | EC | EC | EC | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | (⌐) | ⌐ | EC | EC | ⌐ | EC | EC | ⌐ | ⌐ | EC | EC | EC | EC | ⌐ |  |  |
|  | 2000 |  | R | R |  |  | R |  |  |  |  |  |  |  |  |  |  |  |  |  |  | R |  |  |  |  |  |  | R | R | R |  |  |
| ███ | 800 | ⌐ | ⌐ | ⌐ | EC | EC | EC | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | H | EC | EC | ⌐ | EC | EC | ⌐ | ⌐ | EC | EC | EC | EC | ⌐ | ⌐ |  |  |  |
|  | 2000 |  | R | R |  | R |  |  |  |  |  |  |  |  |  |  |  |  |  | R |  |  |  |  |  | R | R | R |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

| Name: | | Name: | Initial | Name | Initial | Name | Initial |
|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | COI M. Cruz | *(init)* | Norel Centro RN | *(init)* | | |
| Rocel Cariaso, RN | | COL R. sagam | *(init)* | Dr. J. Cabrera | *(init)* | | |
| Benoit Espattolo RN | ⌐ | | | | | | |
|  | | | | | | | |
|  | | | | | | | |

**R** - Refused
**O-S** Out of Stock
**I-C** Incomplete
**C** - Complete

Case 1:99-cv-00017 Document 65-1 Filed 04/30/14 Page 71 of 73

EXHIBIT G--MEDICAL CARE

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Inmate's Name: ██████████  Remaining refills _____  Allergies: _____

Hospital number ██████████ _____ _____

Date of birth ██████████

| Medication/dosage | Time | Date Started: | | | | | | JANUARY 2013 | | | | | | | | | | | | | | | Date Completed: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| ██████████ | 800 | ec | ec | / | ec | | | ec | ec | ec | ec | ec | ce | ec | ce | ec | ce | ⌐ | ⌐ | ⌐ | ⌐ | ⌐ | ec | ec | ec | ec | ⌐ | ⌐ | ⌐ | ec | ec | ec | ec |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ██████████ | 800 | ec | ec | H | a | | | ec | | ec | ec | ec | ec | ec | ec | a | ec | ⌐ | ⌐/ | | ⌐ | ⌐ | ec | ec | ec | ec | ⌐ | ⌐ | ⌐ | ec | ec | ec | ec |
| | 2000 | | | | | | | FB | | | ol | | to | | BP | | | BP | | | | BP | BP | BP | | | | | | | | |
| ██████████ | 800 | ec | ec | H | ec | | | ec | | ec | ec | ec | ec | ec | ec | a | ec | ⌐ | ⌐ | | ⌐ | ec | ec | ec | ec | ⌐ | ⌐ | ⌐ | ec | ec | ec | | |
| | 2000 | | | | | | | FB | | | ol | | M | | BP | ⌐ | | BP | | | | BP | BP | BP | | | | | | | | |
| ██████████ | 2000 | | | | | | | FB | | R | ol | | M | | BP | | | BP | | | | BP | BP | BP | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ██████████ | 2000 | | | | | | | | | R | ol | | | | BP | | | BP | | | | BP | BP | BP | | | | | | | | |

| Name: | | Name: | | Initial | Name | | Initial | Name | Initial | |
|---|---|---|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | CO3. F. BILLY | | FB | Lorato Espanola | | ⌐ | | | R-Refused |
| Lizana | R | CO2 A. Cofun | | R | CO2 B. Peter | | BP | | | |
| Rocel Cariaso, RN | | CAPT. T. TAISAO | | 46 | SGT. A. Muanao | Ally. | | | | O-S Out of Stock |
| | | CO2. B. Peter | | BP | B. Aguno | Σ | | | | |
| | | CO2 B. Peter | | BP | | | | | | I-C Incomplete |
| | | CO2 B. Peter | | BP | | | | | | |
| | | CO2 B. Peter | | BP | | | | | | C-Complete |

000070

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Inmate's Name: ▆▆▆▆▆▆▆    Remaining refills _____    Allergies: _____

Hospital number ▆▆▆▆▆▆

Date of birth ▆▆▆▆▆

Case 1-99-cv-00017   Document 65-1   Filed 04/30/14   Page 72 of 73

EXHIBIT G--MEDICAL CARE

000071

| Medication/dosage | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date Started: | | | | | | | | | JANUARY 2013 | | | | | | | | Date Completed: | | | | | | | | | | | | | | | |
| ▆▆▆▆ | 630 | | | | | | | | | | | | | | | | | BP | FB | | BP | | | | マ BP | BP | BP | マ | | | | |
| | 1130 | ec | ec | | ec | | | ec | ec | ec | ec | ec | ec | Ge | ec | ec | ec | マ | マ | マ | マ | ec | ec | ec | ec | マ | マ | マ | ec | ec | ec | ec |
| | 1700 | ec | ec | | ec | | | ec | ec | ec | ec | ec | ec | ec | ec | ec | ec | マ | マ | マ | マ | ec | ec | ec | ec | マ | マ | マ | ec | ec | ec | ec |

| Name: | | Name: | Initial | Name | Initial | Name | Initial |
|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | CU2 B Peter | BP | SGT. A. Manilao | Umu | | |
| | | CO3 F. BILLY | FB | | | | |
| Renato Espanola | ∴ | CO2 B. Peter | BP | | | | |
| | | CO2 B. Peter | BP | | | | |
| | | CO2 B. Peter | BP | | | | |
| | | CO2 B. Peter | BP | | | | |
| | | B. Aguiro | ☉ | | | | |

R-Refused

O-S Out of Stock

I-C Incomplete

C-Complete

EXHIBIT G—MEDICAL CARE

# DEPARTMENT OF CORRECTIONS MEDICATION ISSUANCE SHEET

Inmate's Name: ▮▮▮▮▮▮▮  Remaining refills _____  Allergies: _____

Hospital number ▮▮▮▮▮▮▮

Date of birth

| Medication/dosage | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Date Started: | | | | | | | | JANUARY 2013 | | | | | | | | | | | | | | | | | | Date Completed: | | | | |
| ▮ | 800 | ac | ac | ↑ | ac | ↑ | ac | | ac | ac | ec | ac | ac | ac | ac | ac | ✓ | ↗ | ↗ | ↗ | ac | ec | ec | ec | ↗ | ↗ | | ec | ec | ac | ec |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ▮ | 800 | ac | ac | ↑ | ac | ↑ | ac | | ac | ac | ec | ac | ac | ec | ec | ac | ✓ | ↗ | ↗ | ✓ | ac | ac | ac | ac | ↗ | ↗ | | ec | ec | ac | ac |

000072

| Name: | | Name: | Initial | Name | Initial | Name | Initial | |
|---|---|---|---|---|---|---|---|---|
| Elaine Camacho, RN | | Renato Espanola | ↗ | Janel T. Beaben | ✓ | | | R-Refused |
| Rocel Cariaso, RN | | | | | | | | O-S Out of Stock |
| | | | | | | | | I-C Incomplete |
| | | | | | | | | C-Complete |